**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| VIPUL P. PATEL, et al., Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 17-CV-4008 |
| ZILLOW, INC. and ZILLOW GROUP, INC., | ) ) | Hon. Amy J. St. Eve |
| Defendants. | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

AMY J. ST. EVE, District Court Judge:

Defendants Zillow, Inc. and Zillow Group, Inc. (collectively, "Zillow") have moved to dismiss the Class Action Complaint ("CAC") of Plaintiffs Vipul Patel; Bhasker Patel and Jyotsna Patel, as co-trustees of the Jyotsna Patel Living Trust; and Castle Bldrs.com, an Illinois corporation (collectively, "Plaintiffs"). For the following reasons, the Court grants Defendants' motion.

**BACKGROUND**[1]

Zillow operates a website that publishes information about real estate, including "Zestimates"—"Zillow's estimated market value for . . . individual home[s]." (R. 1-1, CAC, Ex. 6; *see also id.* at ¶¶ 1, 9(a), 19.) Zillow arrives at a Zestimate through "a computer algorithm" based on a "proprietary formula." (*Id.* at ¶ 20.) The Zillow webpage information attached to the CAC indicates that a Zestimate "is calculated for about 100 million homes nationwide" and "is a

---

[1] The Court takes the facts presented in the Background from the CAC and presumes them as true for the purpose of resolving the pending motion to dismiss under Rule 12(b)(6). *See Teamsters Local Union No. 705 v. Burlington N. Santa Fe, LLC*, 741 F.3d 819, 823 (7th Cir. 2014); *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665–66 (7th Cir. 2013); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

starting point in determining a home's value and is not an official appraisal." (*Id.*, Ex. 6.)

Additionally, the webpage says that "[t]he Zestimate is automatically computed daily based on

millions of public and user-submitted data points." (*Id.*) That public and user-submitted data

includes information regarding "[l]ocation, lot size, square footage, number of bedrooms and

bathrooms," "[p]roperty tax information, actual property taxes paid, exceptions to tax

assessments," "[a]ctual sales prices over the time of the home itself and comparable recent sales

of nearby homes." Zillow, *Zestimate*, https://www.zillow.com/zestimate (last visited Aug. 10,

2017) (hereinafter "Zestimate Webpage").[2] Zillow's website includes information that

Zestimates are not necessarily accurate. (*Id.*, Ex. 6.) Indeed, the website reports their "median

error rate of 5.6%, which means that half of the Zestimates in an area are closer than the error

percentage and half are farther off." (*Id.*) The website also includes accuracy information

broken down by major metropolitan areas. In Chicago, for example, the median error rate of

Zestimates is 3.6%, 60.9% of Zestimates are within 5% of sale price, 79.4% are within 10% of

sale price, and 90.4% are within 20% of sale price. (*Id.*; *see also* Zestimate Webpage.)

       Plaintiffs allege that the Zestimates fall short of the Uniform Standards of Professional

Appraisal Practices ("USPAP") because "there is no 'secret sauce' in the world of

appraisal/valuation law," and "an appraiser would study a given property and determine what

---

[2] The quoted text appears on the web page in Exhibit 6 attached to the CAC, though the attached exhibit omits the above text. The Court may consider the full webpage. On a motion to dismiss, "a court may consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). Plaintiffs refer to the webpage in question in the CAC, the webpage is central to Plaintiffs' claims, and Plaintiffs attach the webpage to the complaint, although in an incomplete format because various drop-down options are not expanded. *See Twombly*, 550 U.S. at 568 n.13 ("The complaint quoted a reported statement of Quest's CEO . . . . This was only part of what he reportedly said, however, and the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn."); *see also Elesh v. Mortg. Elec. Registration Sys., Inc.*, No. 12 C 10355, 2013 WL 4476547, at *1 n.1 (N.D. Ill. Aug. 16, 2013) ("[The plaintiff] attached only partial copies of some of the documents accompanying his amended complaint. In those instances, the Court has considered the complete copies attached to [the defendant's] motion to dismiss."); *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 880 n.2 (N.D. Ill. 2009).

comparable properties are appropriate and, further, weed out the inappropriate properties in its valuation analysis." (R. 1-1 at ¶ 20.)  Additionally, Plaintiffs claim, "the property owner would have the right to review the appraiser's work." (*Id.*)  According to Plaintiffs, "Zillow does not allow any mechanism for Plaintiffs and/or the Class to cure and/or demand removal of their listing and/or the 'Zestimate.'" (*Id.* at ¶ 36.)

Zillow also publishes profiles about homes, which are at least sometimes accompanied by advertisements for real estate agents. (*Id.* at ¶¶ 35, 42, Exs. 1–5.)  A profile may exhibit information about a home, including images of it, its age, square footage, and the number of bedrooms and bathrooms. (*Id.*, Exs. 1–5.)  A profile may also include a Zestimate, whether the home is on the market, and, if the home is for sale, the asking price. (*Id.*, Exs. 1–5.)

Plaintiff Vipul Patel ("Vipul") owns property in Schaumburg, Illinois that is listed on Zillow. (*Id.* at ¶ 1, Ex. 1.)  Zillow indicates that Vipul's property is on the market for $1.495 million and that the Zestimate for the home is $1,068,677. (*Id.*, Ex. 1.)  Plaintiffs Bhasker Patel and Jyotsna Patel (the "Trustee Plaintiffs") own two properties in Schaumburg and one property in Barrington, Illinois. (*Id.* at ¶ 2, Ex. 2–4.)  One of the Trustee Plaintiffs' properties is listed as off the market and has a Zestimate of $567,292. (*Id.*, Ex. 3.)  Another of the properties is listed as on sale for $2.999 million with a Zestimate of $2,525,227. (*Id.*, Ex. 2.)  The final property is listed as on sale for $1.995 million with a Zestimate of $1,168,725. (*Id.*, Ex. 4.)  Plaintiff Castle Bldrs.com, Inc. owns property in Schaumburg as well. (*Id.* at ¶ 3.)  It is listed as off the market with a Zestimate of $608,015. (*Id.*, Ex. 5.)  Plaintiffs bring this action on behalf of a class of "all current owners of real estate property located in Illinois whose property(ies) are listed on Zillow's website." (*Id.* at ¶ 7.)

3

In Count I of their complaint, Plaintiffs seek an injunction under the Illinois Real Estate Appraiser Licensing Act (IREALA), 225 ILCS 458/1 *et seq.* (*See id.* at ¶¶ 13–22.) Plaintiffs claim that Zestimates are "real estate appraisals" under IREALA, 225 ILCS 458/5-5, that Zillow is unlicensed to make. (*Id.* at ¶¶ 16, 19.) Plaintiffs claim they "will continue to suffer irreparable injury with the current 'Zestimate' placed by Zillow relative to their properties without the granting of an injunction to prohibit [Zillow's] conduct." (*Id.* at ¶ 21.)

In Count II, Plaintiffs seek an injunction, damages, and punitive damages for invasion of privacy. (*Id.* at ¶¶ 23–38.) Plaintiffs claim that Zillow has "unilaterally and willfully opted to disregard Plaintiffs' . . . right to seclusion by publicly disseminating appraisal/financial opinions relative to real property for the general public for review." (*Id.* at ¶ 29.) Additionally, Plaintiffs allege that Zillow violated Plaintiffs' right to seclusion by (1) "gathering financial information regarding their real estate asset's value without the express and advance consent of Plaintiffs," (2) compiling that information to create the Zestimate, (3) publicly disseminating the Zestimate without consent, and (4) refusing to allow Plaintiffs to opt out of the disclosure of the Zestimate. (*Id.* at ¶ 31.) Plaintiffs seek an injunction as well as damages due to a low Zestimate "driving away potential buyers," a low Zestimate "causing buyers to harass sellers with the admittedly incorrect information that not be published," a low Zestimate "adding unnecessary expense relative to the sale process" due to increased time taken to sell the property, a low Zestimate "forcing many sellers to hire brokers because of the confusion created by Zillow," and a low Zestimate in some cases "causing property owners to withdraw their selling for sale altogether due to their inability to sell the property." (*Id.* at ¶ 33.)

Plaintiffs allege that the CEO of Zillow Group, Spencer Rascoof, has "public[ly] bragged on Twitter that the 'Questions about the Zestimate are an opportunity [for real estate brokers who

pay Zillow for seller leads] to get the appointment.'"  (*Id.* at ¶ 35 (second alteration in original).)

According to Plaintiffs, this means "Zillow has affirmatively and publicly embraced the fact that

the confusing and inaccurate 'Zestimate' tool is nothing more than an improper marketing ploy

for Zillow's premier agents to use in further invading the Plaintiffs' and the Class' right to

seclusion."  (*Id.*)  Furthermore, Plaintiffs allege that Zillow has admitted that real estate brokers

should "use the flawed 'Zestimate' as a way to establish a client/broker relationship with the

confused Plaintiffs and Class" because real estate brokers can "explain[] how the 'Zestimate' is

calculated and what its strength and weaknesses are [to] help[] prove that value add [by you the

real estate broker] to your client [the property owner]."  (*Id.* at ¶ 37 (final two alterations in

original).)  This, Plaintiffs claim, means "Zillow has publicly admitted that not only was their

invasion upon Plaintiffs' and the Class' seclusion intentional, but that their 'Zestimate' tool

should be used to prey upon the Plaintiffs and the Class so as to force them to retain real estate

brokers."  (*Id.* at ¶ 38.)

     In Count III, Plaintiffs seek an injunction, costs, and attorneys' fees under the Illinois

Uniform Deceptive Trade Practices Act ("IDTPA"), 815 ILCS 510/3 *et seq.* based on Zillow

(1) using the Zestimate tool which is likely to confuse the public, (2) failing to disclose to

Plaintiffs that "there is a pre-existing business relationship between Zillow and the real estate

agents listed on the webpage created for Plaintiffs' . . . property and/or that these real estate

agents pay Zillow for 'seller leads' with Plaintiffs ," (3) failing to disclose that Zillow is "aware

of the confusing and incorrect nature of the 'Zestimate,'" (4) failing to disclose that Zillow uses

the Zestimate "as a marketing ploy for their Zillow premier agents to use as a lead to solicit

unsuspecting Plaintiffs," (5) gathering, compiling, assessing, and disseminating Plaintiffs'

financial information without consent, (6) refusing to remove listing or Zestimates upon

Plaintiffs' objection, and (7) listing property and Zestimates without consent to "lure people to the website so that they can thereinafter be solicited by Zillow's premier real estate broker agents for services." (*Id.* at ¶ 42.)

Finally, Plaintiffs seek damages, costs, punitive damages, and attorneys' fees based on violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/2 based on the allegedly deceptive acts discussed above. (*Id.* at ¶¶ 45–52.)

Plaintiffs filed the current action on May 19, 2017 in Illinois state court. (*Id.*) Zillow filed a notice of removal on May 25, 2017.[3] (R. 1.) Zillow then filed the present motion on June 13, 2017, which the Court grants.

## LEGAL STANDARDS

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014); *see also Roake v. Forest Preserve Dist. of Cook Cty.*, 849 F.3d 342, 345–46 (7th Cir. 2017). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*; *see also Oakland Police & Fire Ret. Sys. v. Mayer Brown, LLP*, 861 F.3d 644, 649 (7th Cir. 2017). Put differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

---

[3] Zillow properly asserts that the Court has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In determining the sufficiency of a complaint under the plausibility standard, courts must "accept all well-pleaded facts as true and draw reasonable inferences in [a plaintiff's] favor." *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016).

To the extent Plaintiffs allege fraud, Rule 9(b) applies and imposes a higher pleading standard than that required under Rule 8. *See Camasta*, 761 F.3d at 736; *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446–47 (7th Cir. 2011). Specifically, "plaintiffs must plead the 'who, what, when, where, and how: the first paragraph of any newspaper story' of the alleged fraud." *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)). In other words, "[t]he requirement of pleading fraud with particularity includes pleading facts that make the allegation of fraud plausible"; therefore, "[t]he complaint must state 'the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" *United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1106 (7th Cir. 2014); *see also Rocha*, 826 F.3d at 911. Allegations based on information and belief will not suffice under Rule 9(b) unless "(1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides 'the grounds for his suspicions.'" *Grenadyor*, 772 F.3d at 1108 (quoting *Pirelli*, 631 F.3d at 443); *see also United States ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 370 (7th Cir. 2016).

Rule 9(b)'s heightened standard does not, however, apply to allegations of states of mind. *See* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind

may be alleged generally.").  Instead, Rule 8's standards—as defined in *Twombly* and *Iqbal*—govern.  *See Iqbal*, 556 U.S. at 686–87.

**ANALYSIS**

Zillow argues that the First Amendment requires dismissal of all of Plaintiffs' claims.  (R. 18, Mem. Supp. Mot. Dismiss, 3.)  Additionally, Zillow contends that First Amendment concerns aside, Plaintiffs fail to plead the required elements of their claims.  (*Id.* at 9.)  While Zillow makes persuasive arguments with respect to the First Amendment, the Court need not and should not rule on them conclusively because Plaintiffs' claims fail under Illinois statutory law.  *See Eastland Music Grp., LLC v. Lionsgate Entm't, Inc.*, 707 F.3d 869, 871 (7th Cir. 2013) ("[C]ourts should avoid unnecessary constitutional adjudication."); *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001) ("[F]ederal courts are supposed to do what they can to avoid making constitutional decisions, and strive doubly to avoid making unnecessary constitutional decisions.")

## I.     IREALA Claim

Plaintiffs' IREALA claim fails for at least two independent reasons.  First, IREALA does not apply to Zestimates, which constitute "Automated Valuation Models" under the statute. Second, IREALA does not provide a private cause of action, either explicitly or implicitly.

### A.     IREALA Explicitly Exempts Zillow's Automated Valuation Models

IREALA provides that "[i]t is unlawful for a person to . . . develop a real estate appraisal . . . without a license issued under this Act."  225 ILCS 458/5-5(a)(ii).  IREALA further provides that "'Appraisal' means (noun) the act or process of developing an opinion of value; an opinion of value (adjective) of or pertaining to appraising and related functions, such as appraisal practice or appraisal services."  *Id.* § 458/1-10.   Based on these statues, Plaintiffs argue that

8

Defendants have violated IREALA because they have developed real estate appraisals without a license. (R. 21, Pls.' Opp., 2.) IREALA, however, exempts certain conduct from the licensing requirement. It provides:

> This Act does not apply to an employee, officer, director, or member of a credit or loan committee of a financial institution or any other person engaged by a financial institution when performing an evaluation of real property for the sole use of the financial institution in a transaction for which the financial institution would not be required to use the services of a State licensed or State certified appraiser pursuant to federal regulations adopted under Title XI of the federal Financial Institutions Reform, Recovery, and Enforcement Act of 1989, *nor does this Act apply to the procurement of an automated valuation model*.
>
> "Automated valuation model" means an automated system that is used to derive a property value through the use of publicly available property records and various analytic methodologies such as comparable sales prices, home characteristics, and historical home price appreciations.

§ 458/5-5(g) (emphasis added).

Under Illinois law, statutory interpretation begins with the plain meaning of a statute's text. *See Skaperdas v. Country Cas. Ins. Co.*, 28 N.E.3d 747, 751–52 (Ill. 2015); *Rivera v. Google Inc.*, -- F. Supp. 3d --, No. 16 C 02714, 2017 WL 748590, at *3 (N.D. Ill. Feb. 27, 2017) (citing Illinois law). Where the statutory text bears a plain, unambiguous meaning, a court's inquiry ends. *See Skaperdas*, 28 N.E.3d at 751–52; *People v. Savory*, 756 N.E.2d 804, 810 (Ill. 2001); *see also People v. Nunez*, 925 N.E.2d 1083, 1087 (Ill. 2010); *Rivera*, 2017 WL 748590, at *3. "A reviewing court must enforce clear and unambiguous statutory provisions as written, and it should not read into the statute exceptions, conditions, or limitations not expressed by the legislature." *People ex rel. Glasgow v. Carlson*, 72 N.E.3d 340, 344 (Ill. 2016); *see also Skaperdas*, 28 N.E.3d at 752.

9

The text of the section 458/5-5(g) sets out two separate circumstances in which IREALA does not apply with the phrases "This act does not apply" and "*nor does this act apply*." § 458/5-5(g) (emphasis added). The second, independent clause of the statute (which appears in italics in the block quote above) unambiguously exempts the procurement of Automated Valuation Models without limitation, where the term "procure" means "[t]o obtain" or "[t]o achieve or bring about." *See Procure*, *Black's Law Dictionary* (10th ed. 2014); Bryan A. Garner, *The Elements of Legal Style* 19 (1991) ("The comma separates independent clauses joined by coordinating conjunctions: *and*, *but*, *or*, *nor*, and *for*."); Bryan A. Garner, *The Chicago Guide to Grammar, Usage, and Punctuation* 347 (2016) ("Use a comma when you join two independent clauses with a coordinating conjunction."); *see also Procure*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/procure (last visited Aug. 14, 2017) (stating that the legal definition of procure is "to obtain, induce, or cause to take place," and that the ordinary definition includes to "obtain by particular care and effort," "bring about," and "achieve.") The text of section 458/5-5(g) does not support another reading. Plaintiffs do not dispute Zillow's definition of "procure" nor its contention that Zestimates are an "Automated Valuation Model." (*See* R. 21 at 2–3.) Accordingly, based on the clear text of the statute, IREALA does not apply to Zillow's Zestimates.

Plaintiffs only argument to the contrary is that "it is clear that the plain reading of this exception allows financial institutions (alone) to use automated valuation models for the (sole) purpose of internal loan underwriting." (R. 21 at 2–3 (footnote omitted).) The statutory text does not support this reading. In an independent clause, the relevant text provides, "nor does this Act apply to the procurement of an automated valuation model." § 458/5-5(g). Plaintiffs wish to append language to the end of this independent clause so it would read "nor does this Act apply

to the procurement of an automated valuation model *by a financial institution for the purpose of internal loan underwriting*."  Under Illinois law, however, courts must give effect to the plain meaning of a statute where, as here, one is clear.  *See Skaperdas*, 28 N.E.3d at 751–52; *Rivera*, 2017 WL 748590, at *3.  Additionally, "[a] reviewing court . . . should not read into the statute exceptions, conditions, or limitations not expressed by the legislature."  *Glasgow*, 72 N.E.2d at 344.  Consequently, the Court may not edit the text of the statute as Plaintiffs request.

### B.    There Is No Private Right of Action Under IREALA

Zillow argues that IREALA does not provide an express private right of action and implying one is unwarranted.  (R. 18 at 10.)  Plaintiffs do not dispute that IREALA does not contain an express private right of action.  (R. 21 at 3–4.)  Instead, they argue that "private persons may directly invoke IREALA in order to protect their property right interests."  (*Id.* at 3.)

Under Illinois law, courts imply a cause of action when "(1) the plaintiff is a member of the class for whose benefit the statute was enacted; (2) the plaintiff's injury is one the statute was designed to prevent; (3) a private right of action is consistent with the underlying purpose of the statute; and (4) implying a private right of action is necessary to provide an adequate remedy for violation of the statute."  *Metzger v. DaRosa*, 805 N.E.2d 1165, 1168 (Ill. 2004) (quoting *Fisher v. Lexington Health Care, Inc.*, 722 N.E.2d 1115, 1117–18 (1999)); *Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*, 194 F. Supp. 3d 706, 713 (N.D. Ill. 2016); *Galvan v. NCO Fin. Sys., Inc.*, Nos. 11 C 3918, 11 C 4651, 2016 WL 792009, at *4–5 (N.D. Ill. Mar. 1, 2016).  Courts "should use caution in implying a private right of action, because, in doing so, it is assuming the policy-making authority more appropriately exercised by the legislature."  *Alarm Det. Sys.*, 194

F. Supp. 3d at 713–14 (quoting *Helping Others Maintain Envtl. Standards v. Bos*, 941 N.E.2d 347, 363 (App. Ct. Ill. 2010)).

Plaintiffs do not address the relevant test for implied private rights of action, and Zillow focuses on the final factor. The Court therefore turns to the necessity of implying a private right of action.

IREALA provides for a number of enforcement mechanisms by various state entities. Violation of section 458/5-5(a) is a Class A misdemeanor for a first offense and a Class 4 felony for any subsequent offense. § 458/5-5(a). Additionally, violations of section 458/5-5 may result in "a civil penalty to the Department [of Financial and Professional Regulation] in an amount not to exceed $25,000 for each violation as determined by the Secretary [of Financial and Professional Regulation]" after a hearing "in accordance with the provisions of this Act regarding the provision of a hearing for the discipline of a license." 225 ILCS 458/1-10, 458/15-5(a). All final administrative decisions are "subject to judicial review pursuant to the provisions of the Administrative Review Law." *Id.* § 458/15-20(a). Additionally, "[t]he Secretary [of Financial and Professional Regulation], the Attorney General, or the State's Attorney of any county in the State may maintain an action for injunctive relief in any circuit court to enjoin any person from [practicing as an appraiser without holding a valid license]." *Id.* § 458/15-5(d). IREALA gives the Department of Financial and Professional Regulation authority to "investigate any activity that may violate [IREALA]." *Id.* § 458/15-5(b). Furthermore, the Department of Financial and Professional Regulation "may issue cease and desist orders to persons who engage in activities prohibited by this Act." *Id.* § 458/15-60. Any person in violation of a cease and desist order issued by the Department is subject to all of the penalties provided by law." *Id.*

The Illinois Supreme Court has explained that it "implies a private right of action under a statute 'only in cases where the statute would be ineffective, as a practical matter, unless such action were implied.'" *Metzger*, 805 N.E.2d at 1170 (quoting *Fisher*, 722 N.E.2d at 1115). Here, the question is whether it is necessary to imply a cause of action for the injunctive relief Plaintiffs seek in their complaint. (*See* R. 1-1 at ¶¶ 13–22.)

As Zillow contends without Plaintiffs making any argument to the contrary, implying a private right of action for injunctive relief is unnecessary in light of the robust enforcement scheme in IREALA. The statute provides for criminal penalties, a civil penalty up to $25,000 for each violation, and injunctive relief. *See supra*. Three different government actors may pursue that injunctive relief: the Secretary of Financial and Professional Regulation, the Attorney General, or the State's Attorney. Additionally, the statute vests investigative authority and the authority to issue cease and desist orders with a state agency. Given these enforcement mechanisms, the Court cannot conclude that "the statute would be ineffective, as a practical matter," at protecting the public from unlicensed appraisers absent an implied private right of action. *Metzger*, 805 N.E.2d at 1170.

An Illinois court recently came to a similar conclusion in considering another Illinois law, the Cemetery Care Act. There, the statute in question was "replete with sanctions and remedies for violations of its provisions," including criminal penalties for certain violations, fines, and license revocation. *Kagan*, 53 N.E.3d at 269. The court concluded that the enforcement mechanisms provided in the statute were "sufficient to remedy the injury alleged by the plaintiffs, and therefore, it is not necessary to imply a private right of action." *Id.* at 270; *see also Rekosh v. Parks*, 735 N.E.2d 765, 779 (App. Ct. Ill. 2000). In the current case, Plaintiffs seek injunctive relief under IREALA, but the statutory scheme sufficiently allows various

13

government actors to pursue such relief and prevent unlicensed appraisers from harming the public. A private right of action is therefore unnecessary.

Other Illinois cases similarly have found implication of a private right of action unnecessary where the statute in question provided a comprehensive enforcement scheme. In *Metzger*, the Supreme Court of Illinois concluded that the Illinois Personnel Code's enforcement scheme—which included an administrative review process, judicial review of administrative decisions, administrative authority for the Director of Central Management Services to institute actions to secure compliance with the Personnel Code, and criminal penalties—rendered a private right of action unnecessary. 805 N.E.2d at 1170–71. The court, looking to the administrative remedies and the Personnel Code's inclusion of the Illinois Administrative Review Law, reasoned that the legislature did not intend to create a private right of action. *See id.* at 1171 (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985), for the proposition that "[t]he presumption that a [private] remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement." (second alteration in original)). Like the statute at issue in *Metzger*, IREALA provides a similar "comprehensive legislative scheme" for enforcement. Given this express, comprehensive enforcement scheme, the Court, as in *Metzger*, "cannot say that the statutory framework of [IREALA] is so deficient that it is necessary to imply a private right of action." *See id.*; *see also, e.g.*, *Marshall v. Cty. of Cook*, 51 N.E.3d 27, 31 (App. Ct. Ill. 2016) (finding no implied private right of action where "the Cook County State's Attorney can bring an action for any alleged violation"); *Sawyer v. Vivint, Inc.*, No. 14 C 8959, 2015 WL 3420615, at *4 (N.D. Ill. May 28, 2015); *Jandeska v. Prairie Int'l Trucks, Inc.*, 893 N.E.2d 673, 677 (App. Ct. Ill. 2008) ("[P]roviding a private right of action is not necessary to

14

provide an adequate remedy for violation of the statute as section 85 of the Automotive Repair Act provides penalties for violations of the Act").

Cases in which Illinois courts have implied a private right of action are distinguishable. In *Pilotto v. Urban Outfitters West, L.L.C.*, for example, the court considered the Restroom Access Act, which mandates that retail establishments shall allow customers to use employee toilets under certain circumstances. 72 N.E.3d 772, 778 (App. Ill. Ct. 2017). The statute provided a weak remedy: a fine not to exceed $100. *Id.* at 785. The court reasoned that a plaintiff harmed by a violation of the act "would be reluctant to divulge embarrassing information [like an irritable bowel condition] to local authorities in order to pursue the expressed petty offense remedy." *Id.* IREALA's enforcement scheme is far more robust than the one at issue in *Pilotto*, and there is no similar concern that individuals will not report IREALA violations out of embarrassment.

In *Corgan v. Muehling*, 574 N.E.2d 602, 609 (Ill. 1991), the court implied a private right of action in a statute prohibiting individuals from practicing psychology without a valid license. The court explained that a "civil private right of action for compensatory damages [was] necessary to uphold and implement the public policy behind [the statute], to protect the public from persons who are incompetent and unqualified to render psychological services." *Corgan*, 574 N.E.2d at 610. The court further reasoned that "[i]t is unlikely that patients, injured by unqualified and unregistered psychologists, will initiate or pursue their complaints through the administrative of criminal justice system without a potential for a tangible reward." *Id.*

*Corgan* is distinguishable, and the more recent *Metzger* decision provides better guidance as to what the Illinois Supreme Court would do in the current case. *See Blood v. VH-1 Music First*, 668 F.3d 543, 546 (7th Cir. 2012) (noting that when interpreting state law, federal courts

15

must make their best estimate of how the state's highest court would rule, giving "proper regard" to the state's lower courts where the high court has not spoken directly on the issue at hand (quoting *Comm'r v. Estate of Bosch*, 387 U.S. 456, 465 (1967))). First, Plaintiffs do not seek damages under IREALA, (*see* R. 1-1 at Count I), and do not contend that there is an implied private cause of action for damages. In *Corgan*, in contrast, the court noted that a private cause of action "is the only way that an aggrieved plaintiff can be made whole." 574 N.E.2d at 610. Second, while *Corgan* emphasized a plaintiff's ability to be made whole, the *Metzger* court noted that the adequacy of a statute's enforcement scheme does not turn on "the claimed right to compensation for . . . injuries." 805 N.E.2d at 1171. Instead, it focuses on "whether adequate remedies are provided to make compliance with the [statute] likely." *Id.* Third, *Corgan* dealt with the dissimilar context of the psychologist-patient relationship. The court noted that prospective plaintiffs required a tangible reward to pursue complaints through the administrative or criminal justice system. *See Corgan*, 574 N.E.2d at 610. As the Appellate Court of Illinois noted in *Pilotto*, "the reluctance to divulge embarrassing information"—a concern not present in the context of real estate appraisals as it is in the context of an individual's experience with an unlicensed psychologist[4]—brought about the need for a private cause of action for damages. 72 N.E.3d at 785–86.

In short, an implied private right of action is unnecessary under IREALA, which provides a robust enforcement scheme to carry out the Illinois legislature's express goal of "evaluat[ing] the competency of persons engaged in the appraisal of real estate and to license and regulate those persons for the protection of the public." 225 ILCS 458/1-5. Moreover, Plaintiffs make no argument under the relevant test and provide no reason why IREALA would be ineffective, as a

---

[4] Indeed, in *Corgan* the plaintiff alleged that the "defendant repeatedly engaged in sexual intercourse with her 'under the guise of therapy,'" and the plaintiff alleged that the defendant's conduct caused her to feel "fear, shame, humiliation and guilt." 574 N.E.2d at 300.

practical matter, without an implied private right of action.  Consequently, the Court cannot

imply a private cause of action.  *See Abbasi ex rel. Abbasi v. Paraskevoulakos*, 718 N.E.2d 181,

187 (Ill. 1999) ("Since the fourth factor of the [implied private right of action test] is not present,

we do not recognize a private cause of action under the Act.").

Although it cites no cases dealing with Illinois law regarding implied private causes of

action, Plaintiffs argue that "private persons may directly invoke IREALA in order to protect

their property right interests."  (R. 21 at 3–4.)  First, the cases Plaintiffs cite do not concern the

law of the relevant jurisdiction.  Second, IREALA is a statute regulating a profession, not a

statute protecting property rights.  Implying a private right of action to protect property rights

conflicts with the plaint language of the statute.  *See Metzger*, 805 N.E.2d at 1168.  Third, the

cases Plaintiffs cite are distinguishable.  *Doodletop Co. v. Paradise Creations, Inc.*, looked to

precedent in which "New York courts . . . permitted applications for injunctive relief from

allegedly criminal conduct directed towards plaintiff's property rights, trademark and good will."

823 F. Supp. 179, 180 (S.D.N.Y. 1993).  Importantly, *Doodletop* relied upon decades of New

York precedent in which courts determined that a private right of action existed under

predecessor statutes to the statute at issue.  *Id.* at 181.  The court reasoned that, "given that seven

decades have passed since a New York court first found a private right of action arising out of

statutory language identical to that found in Section 33.09, it is more persuasive that there is no

express language that takes away this long-recognized right in New York."  *Id.*  IREALA does

not have a similar history as the statute at issue in *Doodletop*.

Plaintiffs also cite two cases under Virginia law.  Those cases deal with a Virginia rule

that, while "a penal statute . . . does not automatically create a private right of action,

and . . . equity will not enter an injunction merely because such a statute has been violated," there

is a "long standing principle that an injunction is appropriate where violation of a penal statute or penal ordinance results in special damage to property rights which would be difficult to quantify." *See Black & White Cars, Inc. v. Groome Transp., Inc.*, 442 S.E.2d 391, 394 (Va. 1994). Plaintiffs make no argument that the damages they seek would be difficult to quantify. Indeed, they do not seek damages under IREALA. Additionally, unlike the statute at issue in *Black & White*, which concerned the "franchises granted the Cab Companies by Norfolk," the statute at issue here does not confer a property right of any kind. *See id.* at 430.[5]

Accordingly, the Court dismisses Count I with prejudice.

## II.     Invasion of Privacy

Plaintiffs defend their invasion of privacy claim under the rubric of the tort of "intrusion upon seclusion"—one of the four common law invasion-of-privacy torts recognized in many states. (R. 21 at 11–12); *see also Lawlor v. N. Am. Corp. of Ill.*, 983 N.E.2d 414, 424 (Ill. 2012); Restatement (Second) of Torts § 652A (noting the four invasion-of-privacy torts). In 2012, the Illinois Supreme Court recognized the tort of intrusion upon seclusion, though it had previously been an open question in the state whether the cause of action existed under state law. *Lawlor*, 983 N.E.2d at 425.

The Illinois Supreme Court cited the Restatement (Second) of Tort's definition of intrusion upon seclusion: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." *Id.* at 424 (quoting Restatement (Second) of Torts § 652B). Thus, as the parties recognize, there are four elements to the tort: "(1) an unauthorized intrusion or prying into the

---

[5] The other case Plaintiffs cite, *Long's Baggage Transfer Co. v. Burford*, 132 S.E. 355, 352–53 (Va. 1926), dealt with the same legal principles as *Black & White*.

plaintiff's seclusion; (2) an intrusion that is highly offensive or objectionable to a reasonable person; (3) that the matter upon which the intrusion occurs is private; and (4) the intrusion causes anguish and suffering." *Jacobson v. CBS Broad., Inc.,* 19 N.E.3d 1165, 1180 (Ill. App. Ct. 2014); *see also Angelo v. Moriarty*, No. 15 C 8065, 2016 WL 640525, at *4 (N.D. Ill. Feb. 18, 2016). "[T]he nature of this tort depends upon some type of highly offensive prying into the physical boundaries or affairs of another person," and "[t]he basis of the tort is not publication or publicity." *Lovgren v. Citizens First Nat'l Bank of Princeton*, 534 N.E.2d 987, 989 (1989); *see also Angelo*, 2016 WL 640525, at *4. "[A] plaintiff fails to state a claim for invaded seclusion if the harm flows from publication rather than the intrusion." *Thomas v. Pearl*, 998 F.2d 447, 452 (7th Cir. 1993); *see also Angelo*, 2016 WL 640525, at *4.

Plaintiffs' intrusion claim fails for a variety of reasons. Zillow argues that Plaintiffs have not pled any of the four elements of an intrusion claim, but focuses on Plaintiffs' failure to plead an intrusion into private matters. (R. 18 at 12.) According to the CAC and its attachments, Zillow's Zestimates are based on public and user-submitted information, not private information. Plaintiffs therefore do not plead an intrusion into private matters. Additionally, even if a Zillow user somehow intruded on a Plaintiff's seclusion in some objectionable manner and then submitted that information to Zillow, Zillow would not have made that intrusion. *See Lawlor*, 983 N.E.2d at 427 ("Generally, a person injured by the tortious action of another must seek his or her remedy from the person who caused the injury.") While exceptions exist in the context of principal-agent relationships, *see id.*, Plaintiffs do not allege that such a relationship exists between users who submit information and Zillow.

Second, Plaintiffs have not carried their burden with respect to pleading an intrusion that is highly offensive or objectionable to a reasonable person. Plaintiffs offer no argument as to

how any possible intrusion in this case was offensive. Instead, they claim that because Zestimates are unlawful under IREALA, Zillow has committed a highly offensive intrusion. (R. 21 at 12.) Zestimates, however, are not unlawful under IREALA, as explained above. Additionally, even if they were, the *publication* of unlawful information alone says nothing about whether there was a highly offensive *intrusion* to glean the information ultimately published. Moreover, the type of information regarding homes available on Zillow—for example, an image of the home, its size, its estimated market value, and related property tax information—is publicly available.[6] Thus, the alleged intrusion based on gleaning information about Plaintiffs' property is not highly offensive or objectionable. *See Schiller v. Mitchell*, 828 N.E.2d 323, 329 (App. Ct. Ill. 2005) (explaining that if a defendant observed what the public can see, there is no actionable intrusion upon seclusion); *see also Jacobson*, 19 N.E.3d at 1181; *Desnick v. Am. Broad. Cos.*, 44 F.3d 1345, 1353 (7th Cir. 1995) (noting that the right of privacy is aimed at "preventing intrusion into legitimately private activities, such as phone conversations").

Third, Plaintiffs do not plead facts that the intrusion caused anguish and suffering. In the CAC and in their brief, Plaintiffs claim damages because, allegedly, a low Zestimate (1) drives away potential buyers, (2) causes buyers to harass sellers with the incorrect Zestimate, (3) causes Plaintiffs to incur additional expenses due to increased time needed to sell property, (4) "forc[es]" sellers to hire brokers, and (5) causes property owners to withdraw their property from the market. (R. 1-1 at ¶ 33; R. 21 at 12.) All of these claimed injuries "flow[] from publication rather than intrusion." *See Thomas*, 998 F.2d at 452. Plaintiffs therefore do not

---

[6] *See, e.g.*, Cook County Assessor's Office, *Property Search*, http://cookcountyassessor.com/Search/Property-Search.aspx (last visited Aug. 14, 2017). The Court may take judicial notice of this government website. *See Pavone v. Meyerkord & Meyerkord, LLC*, 118 F. Supp. 3d 1046, 1054 n.5 (N.D. Ill. 2015); *Denius v. Dunlap*, 330 F.3d 919, 929 (7th Cir. 2003).

plead that Zillow's alleged intrusion caused anguish and suffering. Plaintiffs suggest that Zestimates somehow allow real estate agents advertising on Zillow to invade Plaintiffs' seclusion. (R. 1-1 at ¶ 35.) Plaintiffs' theory appears to be that Zestimates "pressure the Plaintiffs . . . to retain one of Zillow's 'premier' real estate brokers to resolve valuation issues and help them market the property." (*Id.* at ¶ 36.) Even assuming this "pressure" that causes a putative plaintiff to retain a estate broker would somehow be enough to state a claim, which the Court doubts, Plaintiffs do not allege that they have retained "premier" real estate brokers due to Zestimates. Their speculative theory of harm therefore fails to salvage their claim.[7]

In short, Plaintiffs have failed to allege sufficient facts to state a claim of intrusion upon seclusion. The Court therefore dismisses Count II without prejudice, although the Court doubts that Plaintiffs can successfully replead intrusion upon seclusion based on their allegations that Zillow creates Zestimates based on public and user-submitted information.

### III.    Illinois Uniform Deceptive Trade Practices Act

Plaintiffs seek an injunction and reimbursement of costs and attorneys' fees under the IDTPA. (*See* R. 1-1 at Count III.) In order to obtain relief under the IDTPA, Plaintiffs must show that Zillow engaged in one of the types of deceptive conduct enumerated in the statute. *See* 810 ILCS 510/2; *see Kljajich v. Whirlpool Corp.*, No. 15 C 5980, 2015 WL 8481973, at *5 (N.D. Ill. Dec. 10, 2015). Plaintiffs point to three types of allegedly deceptive conduct: (1) "caus[ing] a likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another," (2) "mak[ing] false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions," and (3) "engag[ing] in any other

---

[7] To the extent Plaintiffs rely on the Code of Federal Regulations, they do not develop their argument in their brief. Any such argument is therefore waived. *Home Care Providers, Inc. v. Hemmelgarn*, 861 F.3d 615, 625 (7th Cir. 2017); *Kugler v. Bd. of Educ.*, No. 16 C 8305, 2017 WL 3581176, at *8 n.7 (N.D. Ill. Aug. 18, 2017). Moreover, Plaintiffs claim that the Zestimates are false, and therefore, Zestimates are not private facts upon which Zillow allegedly intruded.

conduct which similarly creates a likelihood of confusion or misunderstanding." (R. 1-1 at ¶ 41); § 510/2(a)(3), (11)–(12). Under the IDTPA, Plaintiffs "need not prove competition between the parties or actual confusion or misunderstanding." § 510/2(b).

The deceptive practices Plaintiffs allege mostly relate to Zillow's Zestimates. Based on the pleadings, however, Zestimates are not false, misleading, or likely to confuse. The word "Zestimate"—an obvious portmanteau of "Zillow" and "estimate"—itself indicates that Zestimates are merely an estimate of the market value of a property. Moreover, Zillow's website, as alleged in the CAC and the webpage attached to the CAC, discloses clearly and in great detail that Zestimates may not be accurate. Zillow makes clear that a Zestimate "is a starting point in determining a home's value and is not an official appraisal." (R. 1-1, Ex. 6.) Additionally, Zillow's website even provides detailed statistics regarding the accuracy of Zestimates nationally and in particular metro areas, including Chicago. (*See supra* Background.) Plaintiffs claim that Zillow's CEO acknowledged that Zestimates are confusing. (R. 21 at 13; R. 1-1 at ¶ 35.) Here, Plaintiffs refer to a "Tweet" from the CEO in which he allegedly said, "Questions about the Zestimate are an opportunity to get the appointment." (R. 1-1, Ex. 7.) That people merely might have a question about a Zestimate hardly means they are confused or likely to be confused in a manner that is actionable under the IDTPA. Additionally, that Zillow has said real estate agents can show their value to clients by explaining the "strength and weaknesses" of Zestimates does not plausibly support a contention that consumers are likely to be confused as to the nature of a Zestimate.[8]

---

[8] Plaintiffs do not specifically discuss in their brief other allegedly deceptive practices enumerated in the complaint, despite Zillow's persuasive arguments that none of them are confusing or likely to confuse. Given Plaintiffs' lack of substantive argument, the Court will not consider those allegedly deceptive practices. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (explaining that courts will apply the waiver rule when a party fails to develop its arguments); *County of McHenry v. Ins. Co. of the W.*, 438 F.3d 813, 818 (7th Cir. 2006) ("When presented with a motion to dismiss, the non-moving party must proffer some legal basis to support his cause of action."); *R&M Trucking-Intermodal, Inc. v. Dr. Miracle's, Inc.*, 2017 WL 3034673, at *7 (N.D. Ill. July 18, 2017) (noting that

Even viewing the allegations in the light most favorable to Plaintiffs, Zestimates are nonactionable opinions on value. "Generally, an expression of opinion does not constitute a statement of fact and therefore cannot support an action for fraud." *Brown v. Skyline Furniture Mfg., Inc.*, No. 17-cv-1244, 2017 WL 2536590, at *2 (N.D. Ill. June 12, 2017). "Statements as to the value of property are often treated as expressions of opinion and, if so intended and understood, cannot give rise to a fraud claim." *Id.* There is an exception, however, when a representation of value is not an expression of opinion "but is made as a statement of fact for the listener to rely upon." *Id.* (quotation omitted). In other words, if the speaker intends the listener to rely on a putative opinion as fact, then the statement may be deceptive. Thus, a plaintiff stated a claim under the ICFA and the IDTPA based on a book purporting to provide accurate average value of used cars. *See People ex rel. Hartigan v. Maclean Hunter Publ'g Corp.*, 457 N.E.2d 480, 487–88 (App. Ct. Ill. 1983). The court reasoned that "[s]tatements that reported prices are 'average' values imply more than an assertion of opinion and purport to be statements of fact based on data from actual transactions." *Id.* at 487. If such statements were false, they would be deceptive under the law. *Id.* Additionally, the court explained that "the *failure to inform* subscribers, users, and the public that 'Red Book' does not report actual market values but rather reports subjective estimates of prices for automobiles is also deceptive because the actual nature of the reported prices *is not otherwise apparent*." *Id.* (emphasis added). The court explicitly noted, however, "the prices allegedly contained in 'Red Book' are not in themselves deceptive, but become so only in light of defendants' characterization of them as 'official,' 'average,' and

---

when a defendant gives a plausible reason to dismiss a claim, and plaintiff does not respond substantively, the plaintiff "waive[s] any response"). Moreover, even if the Court considered the other alleged deceptive practices claimed in the complaint, Plaintiffs have not alleged that they have suffered harm personally due to these practices. Plaintiffs, for example, do not allege how they have been harmed by Zillow's failure to disclose a pre-existing relationship between Zillow and real estate agents who advertise on Zillow.

'accurate,' etc." *Id.* Critically, "[i]f clearly labeled as an opinion[,] a qualitative evaluation of worth" is not deceptive. *Id.*

Here, unlike in *Hartigan*, Zillow clearly labels Zestimates as estimates, and, as noted above, Zillow goes above and beyond labeling and specifically makes clear that Zestimates are not appraisals, are just a starting point rather than a final accurate valuation, and are not always accurate. Indeed, Zillow provides hard data indicating how accurate Zestimates are, broken down by major metropolitan area. While the form of a defendant's statement is not necessarily controlling and the critical inquiry is how a statement is reasonably understood, *see Rasgaitis v. Waterstone Fin. Grp., Inc.*, 985 N.E.2d 621, 634 (App. Ct. Ill. 2013), given Zillow's representations regarding Zestimates, as pled in the complaint, Plaintiffs have failed to plausibly allege that Zestimates are anything more than nonactionable statements of opinion. *See also Northbound Grp., Inc. v. Norvax, Inc.*, 5 F. Supp. 3d 956, 977 (N.D. Ill. 2013) ("A statement that defendants could generate such numbers of leads is either a prediction or an opinion. Neither provides a basis for a fraud claim."); *Sampen v. Dabrowski*, 584 N.E.2d 493, 498 (App. Ct. Ill. 1991) (explaining that where a valuation was explicitly labeled an estimate, there was no deception); *cf. Rasgaitis v. Waterstone Fin. Grp., Inc.*, 985 N.E.2d 621, 634 (App. Ct. Ill. 2013) (declining to dismiss a cause of action where the plaintiffs alleged that the defendants (1) represented "that [the plaintiffs'] funds were *100% safe* and that the investment plan was a *proven* method to increase their net worth," and (2) "*promised* [plaintiffs] *guaranteed* benefits and $96,000 in returns in five years" (emphasis added except as to second emphasis)).

Additionally, to the extent Plaintiffs are bringing claims based on personal confusion as consumers, their claims also fail. "In order to allege a consumer action under the IDTPA, 'the consumer must allege facts which would indicate that he is likely to be damaged in the future.'"

24

*Kljajich*, 2015 WL 8481973, at *4 (internal quotation marks omitted) (quoting *Popp v. Cash Station, Inc.*, 613 N.E.2d 1150, 1157 (Ill. Ct. App. 1992)).  Consumer IDTPA claims often fail because consumer plaintiffs cannot allege the likelihood of damage in the future.  *See id.*  Here, Plaintiffs allegations make clear that they are aware of all of the supposedly deceptive conduct in which Zillow allegedly engages.  (*See, e.g.*, R. 1-1 at ¶¶ 34–35 (alleging that Zestimates are flawed and misleading); *id.* at ¶ 42 (alleging various allegedly deceptive practices)).  In short, even if the Court assumes Plaintiffs were confused or misled in the past, based on the allegations in the CAC, Plaintiffs are no longer at risk of future confusion based on the supposedly deceptive conduct Plaintiffs allege.  As consumers, they face no risk of future harm.  *See Kljajich*, 2015 WL 8481973, at *4; *see also Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 740–41 (7th Cir. 2014).

To the extent Plaintiffs are claiming harm based on the confusion of others, Plaintiffs' allegations of a likelihood of future harm are overly conclusory.  *See Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 909 N.E.2d 848, 857 (App. Ct. Ill. 2009) (noting that damages are not available under the IDTPA, and that entitlement to injunctive relief turns on showing that the defendant's conduct will likely cause the plaintiff harm in the future).  Outside of conclusory claims, viewing the allegations in the light most favorable to Plaintiffs, they do not plead sufficient facts to plausibly claim that Zestimates cause consumers to avoid Plaintiffs' properties to the extent that Plaintiffs cannot sell their homes at their true market value.  Accordingly, even if Zestimates were likely to confuse consumers—which they are not—Plaintiffs' IDTPA claim based on the confusion of others still fails.  Their prospect of future harm based on marketplace confusion is too speculative.

Accordingly, the Court dismisses Count III without prejudice.

## IV.    ICFA

The ICFA "is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive practices." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010) (quoting *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (2002)).  The statute creates liability for:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILCS 505/2.  For consumers, the elements of an ICFA claim are (1) a deceptive or unfair act or practice, (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice, and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce. *Siegel*, 612 F.3d at 934.  Plaintiffs must also "demonstrate that the defendant's conduct is the proximate cause of [their] injury" and prove "actual damage." *Id.* at 935 (quoting *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 160 (2002)).

The ICFA covers both unfair *and* deceptive conduct. *Id.*  To determine whether a defendant engaged in unfair conduct, courts consider if the conduct at issue (1) violates public policy, (2) is "so oppressive that the consumer has little choice but to submit," and (3) causes consumers substantial injury. *Id.*  To state a claim for deceptive conduct, a plaintiff must show

26

(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff relies on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, (4) actual damage to the plaintiff, and (5) proximate causation. Non-consumers may also sue under the ICFA, although they must prove a nexus between the objectionable conduct and consumer injury. *See GC2 Inc. v. Int'l Game Tech. PLC*, -- F. Supp. 3d --, 2017 WL 2424223, at *8 (N.D. Ill. June 5, 2017); *see also Liston v. King.com, Ltd.*, -- F. Supp. 3d --, 2017 WL 2243099, at *10 (N.D. Ill. May 23, 2017); *Demarco v. CC Servs. Inc.*, No. 1-15-2933, 2017 WL 1148752, at *6 (Ill. App. Ct. Mar. 24, 2017).

Plaintiffs' ICFA claim fails because they have not alleged deceptive conduct or conduct that is likely to confuse consumers, as detailed in the preceding section. The claim also fails because Plaintiffs have not alleged that they suffered actual damage proximately caused by any of Zillow's conduct. As noted in the preceding section, Plaintiffs' theory of harm turns on individuals who would have otherwise been interested in purchasing Plaintiffs' property at their asking price losing interest because of an allegedly low Zestimate. These conclusory allegations are too speculative to survive a motion to dismiss.

Accordingly, the Court dismisses Count IV without prejudice.

## CONCLUSION

For the foregoing reasons, the Court grants Zillow's motion to dismiss with prejudice as to Count I and without prejudice as to Counts II–IV.

**DATED: August 23, 2017**                                    ENTERED

_____
AMY J. ST. EVE
United States District Court Judge

27