IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Vipul B. Patel, individually, Bhasker T Patel,as the co-Trustee of the Jyotsna B Patel Living Trust dated March 9, 2001, Jyotsna B. Patel, as co-Trustee of the Jyotsna B. Patel Living Trust dated March 9, 2001, Castle Bldrs.com, Inc., an Illinois corporation, Nancy Koutropoulos, and Ulysses Koutropoulos, (collectively "Plaintiffs"), individually and behalf of others similarly situated      Plaintiffs<br><br>v.<br><br>Zillow, Inc. and Zillow Group, Inc.<br>     Defendants | Case 1:17-cv-04008 |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Vipul B. Patel, individually, Bhasker T. Patel, as co-Trustee of the Jyotsna B. Patel Living Trust dated March 9, 2001, Jyotsna B. Patel, as co-Trustee of the Jyotsna B. Patel Living Trust dated March 9, 2001, Castle Bldrs.com, Inc., Nancy Koutropoulos, and Ulysses Koutropoulos (collectively and hereinafter "Plaintiffs"), bring this First Amended Class Action Complaint against Defendants Zillow, Inc. and Zillow Group, Inc. for (a) for an injunction, costs and attorneys' fees pursuant to the Uniform Deceptive Trade Business Practices Act, 815 ILCS 510/3, and (b) for actual damages, punitive damages and attorneys' fees pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10.  In support of the First Amended Class Action Complaint, Plaintiffs state as follows:

1

## PARTIES, JURISDICTION AND VENUE

1.      Vipul B. Patel is a Cook County, Illinois resident who owns fee simple title relative to real property located at in Cook County, Illinois.

2.      Plaintiffs Bhasker T. Patel and Jyotsna B. Patel are residents of Cook County, Illinois.  Bhasker and Jyotsna are husband and wife and are co-Trustees under the Jyotsna B. Patel Living Trust dated March 9, 2001 that owns several properties within Cook County, Illinois.

3.      Plaintiff Castle Bldrs.com, Inc. is a duly licensed Illinois corporation with its principal place of business in Cook County, Illinois.  Castle Bldrs.com, Inc. owns real property located at Cook County, Illinois.

4.      Nancy and Ulysses Koutropoulos, at relevant times hereto, own real property located in Cook County, Illinois.

5.      Upon information and belief, both Zillow, Inc. and Zillow Group, Inc. (collectively "Zillow") are Washington corporations doing business in Cook County, Illinois.   Upon information and belief, Zillow conducts business in Illinois.   Upon information and belief, Zillow Group, Inc. contains Zillow, Inc. in its business portfolio.

6.      Here, Zillow has removed this matter from the Circuit Court of Cook County to federal court under the Class Action Fairness Act (CAFA), 28 U.S.C. §1332(d).  Plaintiffs did not object to this removal.  As such, venue and jurisdiction are proper herein.

7.      Plaintiffs preserve Counts I (IREALA) and II (Illinois Tort of Invasion of Seclusion) of the Original Class Action Complaint directed against Zillow, Inc. and Zillow Group, Inc. herein by reference for purposes of appeal.

## CLASS ALLEGATIONS

8.    **Class Definitions:** Plaintiffs bring this action pursuant to 225 ILCS 458/1 on behalf of themselves and all current owners of real estate property located in Illinois whose property(ies) are listed on Zillow's website (the "Class").

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and the members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

9.    **Numerosity**: The exact number of members of the Class is unknown, but individual joinder in this case is impracticable. The Class likely consist of millions of homes and other real estate assets (including but not limited to condominiums and vacant land) within the State of Illinois and listed on Zillow's website. Members of the Class can be easily identified through Zillow's records.

10.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

(a)     Whether Zillow's advertising conduct relative to Plaintiffs and the Class is violative of the Uniform Deceptive Trade Practices Act, 815 ILCS 510/3, that warrants an injunction and an award of costs and attorneys' fees; and

(b)     Whether Zillow's advertising conduct relative to Plaintiffs and the Class property constitutes a violation of the Illinois Consumer Fraud Act, 815 ILCS 505/2, that warrants an injunction and an award of damages, punitive damages and attorneys' fees.

11.     **Typicality**: Plaintiffs' claims are typical of the claims of the other members of the Class in that Plaintiffs and the members of the Class sustained damages arising out of Zillow's uniform wrongful conduct.

12.     **Adequate Representation**: Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class, and they have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiffs.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Class.

13.     **Superiority**: This class action is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The damages suffered by the individual members of the Class will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated

by Defendant's wrongful conduct. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

## COUNT I- REQUEST FOR INJUNCTION AND REIMBURSEMENT OF COSTS AND ATTORNEYS' FEES PURSUANT TO THE UNIFORM DECEPTIVE TRADE PRACTICES ACT, 815 ILCS 510/3 et seq.[1]

14.     Plaintiffs and the Class reincorporate paragraphs 1 through 13 as though stated herein by reference as paragraph 14.

15.     At all times relevant hereto, the Uniform Deceptive Trade Businesses Act has applied.  In relevant part, it provides as follows:

> A person likely to be damaged by a deceptive trade practice of another may be granted injunctive relief upon terms that the court considers reasonable. Proof of monetary damage, loss of profits or intent to deceive is not required. Relief granted for the copying of an article shall be limited to the prevention of confusion or misunderstanding as to source.
>     Costs or attorneys' fees or both may be assessed against a defendant only if the court finds that he has wilfully engaged in a deceptive trade practice.
>     The relief provided in this Section is in addition to remedies otherwise

---

[1]     Plaintiffs preserve the issue of (a) whether Zillow's conduct violates 225 ILCS 5/5-5; (b) whether exception of 225 ILCS 485/5-5(g) encompasses Zillow's conduct; and (c) whether Plaintiffs have standing to make these licensing arguments either directly under 225 ILCS 458/5-5 or indirectly under 815 ILCS 510/3 and/or 815 ILCS 505/2.

available against the same conduct under the common law or other statutes
of this State.

815 ILCS 510/3.

16.    "Deceptive trade practices" are defined by the Uniform Deceptive

Trade Practices Act as follows:

Deceptive trade practices.
(a) A person engages in a deceptive trade practice when, in the course of his or her
    business, vocation, or occupation, the person: ….
        (3) causes likelihood of confusion or of misunderstanding as to affiliation,
    connection, or association with or certification by another;
        ****
        (8) disparages the goods, services, or business of another by false or
    misleading representation of fact;

        (9) advertises goods or services with intent not to sell them as advertised

        ****

        (11) makes false or misleading statements of fact concerning the reasons for,
        existence of, or amounts of price reductions;

        (12) engages in any other conduct which similarly creates a likelihood of
        confusion or misunderstanding.

(b) In order to prevail in an action under this Act, a plaintiff need not prove
    competition between the parties or actual confusion or misunderstanding.
(c) This Section does not affect unfair trade practices otherwise actionable at common
    law or under other statutes of this State.

815 ILCS 510/2(a)-(c).

7.    Zillow claims to be the "largest real estate media company in the world".

In an early 2016 interview, Zillow claimed to have over 2,000 employees and around 140

million        monthly        unique        users.        (Source        *Geekwire*

https://soundcloud.com/geekwire/zillow-at-10-spencer-rascoff-rich-barton-and-lloyd-

frink ).

6

18.    In relevant part, Zillow engages in the business of providing advertising for real estate brokers and lenders through their internet websites.  In exchange for advertising monies paid to Zillow, real estate brokers and lenders are therein featured on various web pages throughout the Zillow website.  The advertising includes links to these brokers on individual homes/properties, including but not limited to those of the Plaintiffs and the Class.

19.    Those brokers who pay Zillow for advertising space are given the name "premier agents" by Zillow. The breadth of a given broker's advertising is dependent on how much they pay to Zillow.  These premier agents are displayed on active listings within a certain geographic/zip code radius.  Thus, buyers or sellers who are reviewing a given property on Zillow's site use Zillow's premier agent advertising to connect with and retain that broker by clicking on the advertising link.   In addition, Zillow encourages premier agents to solicit "premier lenders" to also advertise on Zillow's web page listings for active home/property listings; in exchange for the lender's paid advertising, Zillow reduces the advertising amounts paid by the premier agents to Zillow to incentivize them to bring in lenders to their website.

20.    Zillow announced in its August 2017 SEC Quarterly Report that it is under investigation by the CFPB for violation of the ant-kickback/referral provisions of RESPA relative to its co-marketing advertising.  RESPA governs providers of settlement services (i.e. lenders, real estate brokers and others) relative to federally related mortgage loans. 12 U.S.C. §2607(a); 24 CFR §3500.14; see also CFPB Compliance Bulleting 2015-05 (October 8, 2015).

21.    Here, Plaintiffs claim that Zillow is engaging in a confusing, unfair and deceptive marketing scheme that impairs home owners and sellers relative to the sale of their homes.   Although the Plaintiffs are sellers, not buyers, these transactions also indirectly trigger the RESPA anti-kickback/referral policy concerns because they lead to increased settlement costs in the form of increased real estate broker fees for all parties to the transaction, including but not limited to prospective lenders in federally backed mortgages.   As such, Zillow's confusing, unfair and deceptive marketing practices (outlined below in detail) not only violate public policy relative to the Plaintiffs, but also trigger substantial and additional federal public policy concerns in the national real estate and lending markets generally.

**The "Seller Boost" Zillow Program**

22.    In addition to the general advertising on its webpage, Zillow has developed a marketing program called "Seller Boost" in an effort to generate seller leads to real estate brokers whom they call "premier agents". (Source: https://www.youtube.com/watch?v=SZcNZ1X2K94 ("Introducing Seller Boost: The Seller Leads Program from Zillow and Trulia")).   In exchange for this additional advertising payment that the premier agents pay Zillow, Zillow promises "seller leads" on every zip code that the Zillow premier agent operates in.

23.    The way that Zillow draws in the sellers to its website is to unilaterally post information relative to a home-owners/seller's property on their website without the advance permission of homeowners, including but not limited to Plaintiffs and the Class.

24.    In February 2016, Zillow stated that they "attract a huge audience of consumers by providing them access to real estate information."

https://soundcloud.com/geekwire/zillow-at-10-spencer-rascoff-rich-barton-and-lloyd-frink   Specifically, in their Seller Boost video, Zillow advises its premier agents that the Zestimate brings in "tremendous volumes of active and potential home sellers" to Zillow's website. https://www.youtube.com/watch?v=SZcNZ1X2K94

      25.     In a *Geekwire* February 2016 interview, Zillow explained their marketing reason behind posting a Zestimate "point" (i.e. precise monetary value) to each home was/is intentional to "provoke" and to incite "voyeurism" so as to draw consumers to their website and, further, that they are indifferent as to the accuracy of the automated valuation methodology that they implemented in the process:

> Zillow: Not for a second have we regretted taking, you know, a dollar value and putting it on a map on every single home because it gives people such a great sense for the value of homes that are out there.

> Geekwire Q: Was it intentional, though…I mean, there is an element to it that sparks people or maybe pokes people a little in the nose with the idea? Was that intentional or were you surprised by the reaction when people came out and were battling over their estimate?

> Zillow: Totally intentional…of course.  The Zestimate is very provocative and personal and a little voyeuristic.  We knew, when we thought up the Zestimate, we knew that we were up to something, you know, pretty big…. We knew we were onto something interesting and intriguing. And as, you know, it does have the kind of provocative voyeuristic appeal-- the Zestimate.   But it turns out, it's a critical piece of marketplace information.   You know… it really is a critical piece of practical information, as well as emotional.  And it was at the intersection of those two things that is the reason that I think it was so successful…. We knew that it was a starting point.  We argued a lot about whether we should do a range or a point.  Whether the Zestimate should be a range or a point.  And we decided that it should be a point because points are more provocative than ranges.

> Zillow: And we decided that we were going to do it on every home.  A lot of these existing AVMs, automated valuation models, would only you know do the homes that they were certain of.  The ones kind of in the middle of the market.  Not the high end or the low end.  We said "nope" we are going to take out best guess on every one of them.

….

Geekwire Q: So when you were launching the Zestimate what was the process like? I mean, did you know that you were going to go out from a "pr" standpoint, did you go out aggressively to really pump this out there? I'm remembering back to some of out own coverage.  It seemed like it was very intentional, as you said, to go out there with a "pr" message.

Zillow: It was…  And so for about two weeks prior to launch we went on a media tour…  We met with probably a hundred different journalists around the country…..  And so then the day that we launched, there was a huge hubbub.  There was a big article in the Wall Street Journal.  You … helped break the story at the time…  It was in the New York Times.  Really mass media picked it up very quickly.  We had over a million people visit the site by the second day. And I think by the fifth day we had over two million people and the site crashed.  We were down for gosh probably around six hours or so.  We were scrambling to add capacity and to get the site back up.  It turned out to be a blessing in disguise, of course…  It extended the story and it created even more intrigue…. You know… 'I want to go to that website'.

(Source:  https://soundcloud.com/geekwire/zillow-at-10-spencer-rascoff-rich-barton-and-lloyd-frink )

26.     Zillow also makes no effort to follow USPAP guidelines and/or USPAP rules of ethics in (a) their valuations of Plaintiffs and/or Illinois homeowners and/or (b) keeping valuation opinions private. As to the latter, the USPAP rules of ethics prohibit the public dissemination of appraisals/opinions of value:

> Confidentiality:
> An appraiser must protect the confidential nature of the appraiser-client relationship.
> An appraiser must act in good faith with regard to the legitimate interests of the client in the use of confidential information and in the communication of assignment results.
> An appraiser must be aware of, and comply with, all confidentiality and privacy laws and regulations applicable in an assignment. [13]
> An appraiser must not disclose: (1) confidential information; or (2) assignment results to anyone other than:
> - the client;
> - parties specifically authorized by the client;

- state appraiser regulatory agencies;
- third parties as may be authorized by due process of law; or
- a duly authorized professional peer review committee except when such disclosure to a committee would violate applicable law or regulation.

An appraiser must take reasonable steps to safeguard access to confidential information and assignment results by unauthorized individuals, whether such information or results are in physical or electronic form.

An appraiser must ensure that employees, co-workers, sub-contractors, or others who may have access to confidential information or assignment results, are aware of the prohibitions on disclosure of such information or results.

> 13. For example, pursuant to the passage of the Gramm-Leach-Bliley Act in November 1999, some public agencies have adopted privacy regulations that affect appraisers. The Federal Trade Commission (FTC) issued two rules. The first rule (16 CFR 313) focuses on the protection of "non-public personal information" provided by consumers to those involved in financial activities "found to be closely related to banking or usual in connection with the transaction of banking." These activities include "appraising real or personal property." See GLB-Privacy. The second rule (16 CFR 314) requires appraisers to safeguard customer non-public personal information. See GLB-Safeguards-Rule. Significant liability exists for appraisers should they fail to comply with these FTC rules.

USPAP, 2016-207 edition, p. 10 (Confidentiality rule of ethics). USPAP is the valuation standard recognized by the appraisal industry.

**Zillow Tells The Buyer Consumer Public That The Zestimate is an "Accurate" Valuation Tool**

27.    Zillow promotes its Zestimate as an "accurate" opinion and "valuation tool" for prospective buyers.  In doing so, it is the intention of Zillow that the prospective buyers rely on their description of the Zestimate as an valuable resource/opinion.  For example:

(a)     In May 2014, Zillow described the Zestimate to *Reverse Mortgage Daily* as follows:

> Consumers and real estate professionals can use the tool to better understand how local housing trends can affect the future value of specific properties, Zillow says. The forecast adds an additional layer of information to Zillow's real-time database of homes, including "rich data," Zestimates, and Rent Zestimates on more than 100 million homes across the country.
>
> "When Zillow first launched its Zestimate home valuation in 2006, we introduced an important layer of transparency to the real estate market to empower consumers to make better decisions," said Zillow Chief Economist Dr. Stan Humphries, who created the proprietary Zestimate algorithm. "Today, Zillow lets you see historical Zestimates over the past 10 years, and now the new Zestimate forecast provides a unique glimpse into the future never before possible at the home level.

(Source            https://reversemortgagedaily.com/2014/05/14/new-zillow-zestimate-tool-forecasts-future-home-values/ ("New Zillow Zestimate Tool Forecasts Future Home Values")

(b)     In June 2016 Stan Humphries, Zillow Group chief analytics officer and creator of the Zestimate, told *Housing Wire*:

> "Homes are a big investment, so if you own one, you're probably wondering what it's worth. That's why we created the Zestimate – to freely give consumers as much information as possible about the housing market and homes, so that they can make smart decisions when buying or selling…Since we launched the Zestimate 10 years ago, we have been continually working on making it even better," Humphries continued. "With the additional statistical models and computing power behind today's update, we are able to provide consumers even better information about millions of homes, equipping them to make informed decisions…"

(Source:            https://www.housingwire.com/articles/37229-zillow-we-just-dramatically-improved-zestimate-accuracy ).

(c)     On May 24, 2017 (in apparent response to this litigation), Zillow described the Zestimate on CBS This Morning as "[the] type of information that

empowers consumer and helps people make smarter decisions".  Zillow also advised the public that its Zestimate now has a 5% error rate, i.e. implying it was reliable valuation information.

(d )     On May 24, 2017 (again, in apparent response to this litigation), Zillow announced a contest to improve the Zestimate and noted as follows: "The Zestimate is a really accurate computer model about home values, but we think that others can help improve it even more.  A year ago, when we launched, Zestimates had a 14% error rate to now…today…a 5% error rate."  Zillow also described the Zestimate as "really valuable". (Source:   https://www.thestreet.com/video/14149046/zillow-is-offering-1-million-and-a-job-to-anyone-who-can-help-improve-zestimate.html ).

(e)     On August 21, 2017, Stan Humphries of Zillow advised the *Business Radio* of the Wharton School, in a podcast called "Why Automation is Killing the Property Appraisal Business" as follows: ""Back when we launched, we put in about 43 million homes and had a median error rate of close to 14%," he said. "Today, we value about 100 million homes every single night and our error rate is down to 4.3%. So, we've made    a    lot    of    advances    in    the    accuracy    of    valuing    homes." http://knowledge.wharton.upenn.edu/article/home-appraisers/        In    addition,    Stan Humphries of Zillow and the co-hosts of the program disparaged appraisers as being "biased" and "having incentives" to manipulate valuations;  whereas, by contrast, Zillow bragged that their Zestimate was heading towards 2-3% "extraordinary low" error rates. *Id*.

(f)     Immediately after this Court ruled on the motion to dismiss, on August 23, 2017, Zillow stated in a press release to the publication *Geekwire*: "The Zestimate has

proven itself to be a sought-after and valuable free tool for consumers," the statement read. 'It's the most accurate computerized home value estimate anywhere, and serves as an important data point for millions of homeowners, buyers and sellers every day.'" https://www.geekwire.com/2017/judge-dismisses-illinois-class-action-suit-zillow-took-issue-companys-zestimate/

28.    The above press releases by Zillow were intended to encourage the consumer buyer public to continue to be drawn into the Zillow site and, further, to create the perception to these buyers that the Zestimate can be employed by them as an accurate, unbiased, valuable, useful and factual tool in purchasing residential real estate. Conversely, the above press releases by Zillow were an attempt to undermine and disparage properly licensed Illinois professionals, such as appraisers, in an effort to indirectly promote its Zestimate as a better property valuation resource.  In other words, despite their lack of licensure and/or USPAP compliance, Zillow's mass media press releases nevertheless attempt to promote themselves and their Zestimate as a superior valuation resource…even relative to properly licensed Illinois valuation professionals, including appraisers and/or real estate brokers.

**What Zillow Does Not Tell the Consumer Public In Its Advertising to Consumers**

29.    In its advertising to consumers, Zillow does not disclose many material facts,  Specifically, Zillow does not disclose to prospective purchasers that its Zestimate (a) is not based in actual market values; (b) is not prepared by licensed Illinois appraisers; (c) is not based in standards that would be employed by licensed Illinois appraisers; (d) has no basis in USPAP; (e) is not modified even when challenged with certified appraisals and/or comparative market analysis by licensed Illinois professionals; (f) is

based on subjective data, including but not limited to whether or not a broker is associated with the transaction and/or whether the asking price is modified (discussed in more detail below); and (g) has the potential of being severely flawed and is, in fact, often flawed and challenged.

30.     Moreover, Zillow does not tell the general consumer public that it uses the Zestimate as a marketing tool to draw home owners/sellers and buyers to its website in an effort to connect then with their premier agents.

31.     Likewise, Zillow does not tell the general public that it has a financial relationship with its premier agents.  Specifically, Zillow does not explain in its press releases to the general consumer public that Zillow makes tremendous revenue from ads purchased by premier agents and premier lenders who are displayed on their site.  Indeed, Zillow's Jay Thompson noted in a podcast to Zillow's premier agents, "Look at our [SEC] Quarterly Reports.  They are filed with the Security and Exchange Commissions. The vast majority of revenues for Zillow come from real estate agents writing us checks so that they can advertise on the site….Our primary purpose at Zillow is to connect consumer and real estate agents."  (Source: "Zillow Myth: Zillow Wants to Eliminate Real Estate Agents" https://www.youtube.com/watch?v=teDkxnCYNt8 ).  Moreover, In February 2016, Zillow claimed that it had generated $35 billion in real estate advertising revenue from real estate professionals.  (Source: https://soundcloud.com/geekwire/zillow-at-10-spencer-rascoff-rich-barton-and-lloyd-frink ).

32.     Finally, Zillow omits advising its general consumer public that it perpetuates the Zestimate confusion by (a) ignoring and/or refusing to delete and/or correct Zestimate challenges and (b) omitting that there is a marketing reason as to why

Zillow ignores and refuses to cure Zestimate challenges (as discussed further in the next section).

**The Marketing Reason Behind Zillow's Refusal to Correct the Zestimate**

33. Zillow does not simply post advertising by real estate agents and lenders on its website. Rather, Zillow takes the additional step of connecting its consumer audience with real estate brokers and lenders to buy a home and/or finance a mortgage. https://soundcloud.com/geekwire/zillow-at-10-spencer-rascoff-rich-barton-and-lloyd-frink

34. Zillow uses the Zestimate as one of its marketing tools to generate leads between sellers/home-owners and its premier real estate agents. Specifically, in exchange for a "seller lead" marketing payment paid to Zillow by real estate brokers, Zillow thereinafter "funnels" "Harry and Susan" home-owners/sellers to the Zillow "premier brokers". (Source: https://www.youtube.com/watch?v=SZcNZ1X2K94 ("Introducing Seller Boost: The Seller Leads Program from Zillow and Trulia")).

35. Indeed, in its seminars to its premier agents, Zillow has openly admitted that the Zestimate is often inaccurate and confusing despite its mass media statements to the contrary. Further, Zillow has encouraged its premier agents to use the inaccuracy and confusion surrounding the Zestimate as a marketing tool to secure sell-side business from homeowners, sellers and buyers.

(a) For example, Jay Thompson, Zillow director of industry outreach, drafted an article to its premier agents in October 2015 entitled "But Zillow Says My Home is Worth…" In that article, Zillow discussed the inaccuracy and confusion of the Zestimate to its premier agents (conversely, not directed at consumers/buyers/sellers).

At the conclusion of the article, Zillow then suggested to its premier brokers that they use the inaccuracy/confusion created by the Zestimate as part of their marketing pitch to sellers/home-owners:

> "A big part of a real estate agent's job is consumer education. That education includes informing your clients about the Zestimate- - how it's calculated, and how it should and shouldn't be used. Zillow provides a lot of information about the Zestimate and its accuracy. Use that info Zillow provides to help your client understand why you [the premier broker], the real estate professional, are far better suited to provide an opinion of value. Use the "But Zillow says…" conversations to show the value you bring to the transaction. Consumers are smart and once you point them to the right information, they tend to make informed decisions. If they don't, consider getting that real hammer out of the toolbox…[wink emoji]"

A true and correct copy of the October 2013 article by Jay Thompson of Zillow is attached hereto as Exhibit 1 and is incorporated herein by reference.

(b)     Moreover, in March 2014, Spencer Rascoff (CEO of Zillow) publicly bragged to the premier brokers via a "tweet" from a Zillow conference that "Questions are about the Zestimate are an opportunity to get the [brokerage] appointment." A true and correct copy of the tweet is included as Exhibit 2 and is incorporated herein

(c )     Jay Thompson again promoted the Zestimate and its inaccuracy/confusion as potential marketing "angle" to its premier agents in a June 1, 2015 video: "anytime that someone [a property owner]… contacts you [the real broker relative to the "Zestimate"]….you have a live person on the other end of the phone that is interested in real estate….that's not just a lead, that's a smoking hot lead…and that's where explaining how the "Zestimate" is calculated and what its strength and weaknesses are helps prove that value add [by you the real estate broker] to your client [the property owner]. I've had people come up to me at conferences basically saying 'Please don't make this "Zestimate" any more accurate. I love it-- because its an angle—it's a way to start and

establish that conversation, build that trust…' all of those kinda fundamental steps you need to make and take when you first have a contact that you're hopefully ultimately convert into a client." (Source: https://www.youtube.com/watch?list=PLuETP0dUuSkddPEb5uMh_uwvchL5P4do6&params=OAFIAVgX&v=kaNxLGB0ePE&mode=NORMAL&app=desktop. (YouTube: "Zillow Myth: The Zestimate Makes My Job Difficult")).

**Homes That Are Not Yet Listed for Sale**

36.    Zillow funnels different groups of home owners who are upset with their Zestimates to premier agents in different ways. When homes are not yet active/listed, there is an "I disagree" button contained underneath the Zestimate of a given property. From a home owner's perspective, the logical assumption would be that the button takes a seller/homeowner to a Zillow customer service employee to resolve the Zestimate dispute in good faith.

37.    However, this is not the case. Rather, the Zestimate "I disagree" button takes a given home-owner/seller outside of Zillow to a telephone number and e-mail link. The telephone number and link thereinafter connect the home owner not to Zillow customer service, but to a real estate broker.

38.    The marketing purpose of Zillow connecting confused home owners/sellers with premier agents is because Zillow recognizes that "Zestimate calls" stem from those who are "highly engaged" and are the best marketing prospect for a premier agent looking for a seller lead. A Zillow statement to its premier agents on the subject is attached hereto as Exhibit 3 and is incorporated herein by reference. So, in other words, Zillow uses a seller's confusion and complaint relative to the Zestimate as a

means of "funneling" them to the real estate brokers who pay Zillow for advertising/leads. Once these brokers have the home owner on the telephone, the broker then uses the confusion surrounding the Zestimate as part of their sales pitch to the home owner to retain them for their "expert" real estate broker. With the perception that they have nowhere else to turn, the home owner agrees and commits to paying significant commission monies to these brokers.

**Plaintiff Vipul Patel Relative to His Sister's Unlisted Home**

39.  For example, Plaintiff Vipul Patel (who is also a licensed Illinois real estate broker) recently went to go look at the Zillow site and the Zestimate relative to the home of his sister. The property is not yet on the market for sale. The address is 10 Brooke Lane, Barrington, IL. A true and correct copy of the screenshot is attached hereto as Exhibit 4 and is incorporated herein by reference. When he went to challenge the Zestimate referenced on the site by hitting the "I disagree" button in September 2017, he was not directed to Zillow's customer service. Rather, he was directed to input his phone and e-mail and, further, given a phone number to call (847-445-9241). A true and correct copy of the link that Mr. Patel was given after hitting the "I disagree" link is attached hereto as Exhibit 5 and is incorporated herein by reference.

40.  When Mr. Patel called that number, he spoke with a "Greg" located in St. Petersburg Florida at a company called Houses for Sale Network. When Mr. Patel and Greg discussed the Zestimate, Greg explained that he paid $25,000 a month for these leads and that he would list the home for 5% commission and secure approximately a $60,000 a month return in referrals.

41.     Greg then had his "associate" Jonathan from @ Properties in Illinois call Mr. Patel.  When Mr. Patel and Jonathan addressed the Zestimate, Jonathan stated to ignore the Zestimate and that "honestly, it's a bullshit number".  At no point in the conversation did any of these persons make any serious effort to cure or correct the Zestimate; conversely, these real estate brokers just used the conversation as an opportunity to try to convince Mr. Patel to let them list the property.

**Witness and Prospective Class Plaintiff, Erika Gettemy, Relative to Her Unlisted Home**

42.     Witness and prospective class plaintiff, Erika Gettemy, also was unable to cure her unlisted home's Zestimate issue through Zillow in the summer/fall of 2017.  Ms. Gettemy owns a home at 3715 S. Wolcott, Chicago, IL 60609.  A true and correct copy of Ms. Gettemy's Zillow page with the Zestimate is attached hereto as Exhibit 6 and is incorporated herein by reference.  When she clicked the "I disagree" button to question the Zestimate on her home, she was given a phone number (630-480-4605).  A true and correct copy of the link that Ms. Gettemy was given after hitting the "I disagree" link is attached hereto as Exhibit 7 and is incorporated herein by reference.

43.   When Ms. Gettemy called the number, she initially received a computer-generated message advising her to hold for a Zillow agent.  Thereinafter, a woman answered and all she said was "hello".  Ms. Gettemy asked the unidentified woman if she was speaking with someone at Zillow; the woman responded that she was not with Zillow, but rather was a real estate agent.  When Ms. Gettemy told the woman that this was the number that was attached to the Zillow "I disagree" button relative to resolving Zestimate issues, the unidentified woman replied "sorry honey, I am just a real estate agent" and then hung up.

44.     The telephone number that Ms. Gettemy called to request analysis of her Zestimate is that of Illinois real estate Re/Max broker Cindy Banks.  A true and correct copy of a screenshot from one of Cindy Bank's listings on Zillow reflecting her phone number is attached hereto as Exhibit 8 and is incorporated herein by reference.

45.     Third party witness Cindy Banks's telephone number linked to the "I disagree" Zestimate link is a telephone number created by Zillow as part of their leads program.  As a broker for over 30 years, Ms. Banks characterizes Zillow as a "necessary evil" from a marketing perspective.  When Ms. Banks receives calls through Zillow from home owners and prospective sellers, she advises them that there is nothing that she can do to resolve the problem despite the fact that the Zestimate "I disagree" link directs them to her.

**Witness and Prospective Class Plaintiff, Gerald Kelel, Relative to His Unlisted Home**

46.     Witness and prospective class Plaintiff, Gerald Kelel, owns a home at 5027 W. Berteau, Chicago, IL 60641 (P.I.N. 13-16-417-007-0000).  Mr. Kelel is not in the process of selling his home.  Mr. Kelel sometimes monitors his home's Zestimate.  In September 2016, Mr. Kelel had his home officially appraised by a licensed Illinois appraiser.  The appraiser's opinion of value for his home at that time was $500,000.  At no point in time did Zillow ever consider this appraisal and/or request appraisal information from Mr. Kelel in forming their Zestimate opinion relative to his home. A true and correct copy of the first page of Mr. Kelel's 2016 appraisal is attached hereto as Exhibit 9 and is incorporated herein by reference.

47.     At no point in time did Mr. Kelel request Zillow to post information relative to his home on Zillow.  Likewise, at no point in time did Mr. Kelel request

Zillow to publicly post opinions of value relative to his home. Nowhere is it apparent on Mr. Kelel's Zillow page that the Zestimate is contradicted by an appraisal prepared by a licensed Illinois appraiser.

48. In addition, Mr. Kelel's bank (Bank of America) accepts feeds in from Zillow to determine his purported "net worth". Bank of America advises its customers that it accepts Zillow Zestimate home values for monitoring "net worth" and "offset[ting] mortgage liability". There is no explanation as to precisely how Bank of America receives this information, whether Bank of America pays money for the access to the Zestimate, and/or why Zillow transfers this information to Bank of America. A copy of a screenshot from Mr. Kelel's Bank of America page is attached hereto as Exhibit 10. The fact that Bank of America's implements the Zestimate furthers the consumer public perception that the tool is reliable and valuable.

49. In late June 2017, Mr. Kelel's Zestimate was appearing as $589,979 and his Bank of America "net worth" was appearing as $471,556.27. A copy of the Zestimate from this time period is attached hereto as Exhibit 11 and is incorporated herein by reference. A copy of Mr. Kelel's Bank of America screenshot as to his purported "net worth", which incorporates the Zestimate, is attached hereto as Exhibit 12 and is incorporated herein by reference.

50. In early July 2017, Mr. Kelel's Zestimate plummeted to approximately $456,027 and his Bank of America "net worth" likewise dropped approximately $130,000 to a range of $342,440.91 to $340,996.23 for the balance of the July period. A true and correct copy of the Zestimate after the approximate $130,000 plummet is attached hereto as Exhibit 13 and is incorporated herein by reference. See Exhibit 12 for

the Bank of America depreciation in "net worth" and the chart reflecting the plummet of home and net worth value.

51.     Nothing in the public record and/or relative to the property occurred so as to justify the wild swings in the Zestimate during this short time frame.  Moreover, Mr. Kelel questioned the manipulation of the Zestimate and his historical data relative to the Zestimate in an e-mail on July 17, 2017.  In the e-mail, Mr. Kelel notified Zillow of the fact that the Zestimate was contradicted by an appraisal that he had in his possession.  A true and correct copy of his e-mail is attached hereto as Exhibit 14 and is incorporated herein by reference.  Zillow did not respond to Mr. Kelel's e-mail.

52.     When Mr. Kelel's hits the "I disagree" button on his property page on Zillow, Zillow directs him to a phone number (773-985-5912).  A true and correct copy of the screenshot taken by Mr. Kelel is attached hereto as Exhibit 15 and is incorporated herein by reference.

53.     The phone number associated with 773-985-5912 belongs to third party witness Lindsey Henderson-Kuka.  A copy of her webpage is attached hereto as Exhibit 16 and is incorporated herein by reference. Ms. Henderson-Kuka pays Zillow for buyer and seller leads; this phone number is paid for by Zillow as part of the process. Ms. Henderson-Kuka also confirms that, despite the "I disagree" link leading to her, she has no control over repairing the Zestimate valuations assigned by Zillow.

54.     The above acts constitute improper, unfair and deceptive trade practices. Namely:  (a) the Zestimate is an improper, unfair, confusing and deceptive trade practice which creates a misperception of value in the eyes of prospective buyers; (b) Zillow's refusal to address challenged Zestimates constituted an improper, unfair and deceptive

trade practice; and (c) Zillow's re-directing Zestimate challenges to its premier agents to solicit home owners in lieu of resolving Zestimate problems constitutes an improper, unfair and deceptive trade practice.

**Homes for Sale By Owner ("FSBO")**

55.     In the context of For Sale by Owner ("FSBO"), Jay Thompson of Zillow addressed the subject in a video program to its premier agents as follows in June 2015:

> And the bottom line is if you look at the National Association of Realtor's profile of home buyers and sellers that comes out every year. Its got a decade's worth of information that shows that 5, 8, 10% of homes are sold by FSBOS and its been that way since before Zillow launched. Actually the number of FSBOs has gone down since Zillow launched and the number of people using an agent to complete a real estate transaction has gone up since Zillow launched.

(Source: https://www.youtube.com/watch?v=1AdQAdm-_Gw ("Zillow Myth; FSBOS on Zillow Undermine Agents")).

56.     In addition, during that presentation, Zillow's Jay Thompson showed their premier real estate agents a slide that stated: "[m]ore and more consumers are turning to real estate agents. 'Real estate professionals are working more than ever today. According to a recent survey, almost 90% of homebuyers used an agent to help buy their home. In 2001, that number was only 70%.) A true and correct copy of the Zillow presentation slide from the June 2015 presentation is attached hereto as Exhibit 17 and is incorporated herein by reference.

57.     As with unlisted potential sellers, Zillow engages in unfair and deceptive advertising and trade practices so as to force and "funnel" FSBO sellers to the premier brokers.

58.     Unlike a home owner who is not yet on the market, there is typically no "I disagree" button on a home owner's active FSBO site.    Rather, the only place for a FSBO person to go is to send an e-mail to Zillow's customer service (care@zillow.com) department to challenge the Zestimate.    Moreover, Zillow does not make a phone number available for persons who are listed for sale by owner to call.

59.     As above, a home owner who challenges a Zestimate through Zillow's e-mail will not be resolved by Zillow.    Rather, as above, Zillow simply ignores the Zestimate challenge.

**Plaintiffs Nancy and Ulysses Koutropoulos Relative to Their FSBO Home**

60.     For example, Plaintiffs Nancy and Ulysses Koutropoulos own real property located at 1207 Prairie Ave., Barrington, IL 60010 (PIN 01-12-205-002-0000). Zillow unilaterally listed their property on its website and assigned it a Zestimate.  At no point did Zillow ever ask for an appraisal and/or other financial information relative to their property.  Likewise, Zillow never requested financial information relative to the hundreds of thousands of dollars that the Mr. and Ms. Koutropoulos paid in remodeling and upgrading their home.

61.     Initially, in August 2016, Mr. and Ms. Koutropoulos listed their property FSBO on the Zillow website for $945,000.  An appraiser informally and, later, formally advised Mr. and Ms. Koutropoulos that his opinion of value for their home for the time period of September 2016 was $1,080,000. A true and correct copy of the first page of Mr. and Ms. Koutropoulos' appraisal is attached hereto as Exhibit 18 and is incorporated herein by reference.   Nowhere does Zillow advise prospective purchasers that its Zestimate should not be seriously considered in light of the existence of a contradictory certified appraisal.

62.     When Mr. and Ms. Koutropoulos listed the property in 2016, their Zestimate was displaying as less than $600,000.  Mr. and Ms. Koutropolous attempted to adjust the features relative to their Zillow listing to reflect the substantial remodeling and upgrades that they had undertaken.  Their Zestimate remained unchanged despite their efforts.

63.      After listing the property in 2016, Mr. and Ms. Koutropoulos attempted to show the property.  During this time period, they received many calls by potential buyers.  However, in virtually all of the calls, Mr. and Ms. Koutropoulos were questioned as to their asking price given the low Zestimate assigned to their property.  One particular buyer advised Mr. Koutropoulos that it would be a waste of time to view the property given the great disparity in the asking price and the Zestimate figure unless Mr. and Ms. Koutropoulos agreed to lower their asking price to match the Zestimate.  It became obvious to Mr. Koutropoulos that the buyers' incorrect reliance and perception of the Zestimate was a deterrent to their sale of the property.

64.     On one particular showing, there was a couple that expressed great interest in the house.  However, because of the Zestimate, they refused to make an offer above the Zestimate number.  These buyers also rejected the validity of the appraisal value.  The prospective buyers argued that the Zestimate was "gospel" because it was coming from a third-party/neutral website.   Conversely, this prospective buyer would not consider the appraised value because they claimed that the appraisal could have been "manipulated".

65.     During this conversation, the potential buyers also advised Mr. Koutropoulos that a Zillow broker was suggesting that the buyers look to properties listed by other brokers unless Mr. and Ms. Koutropoulos lowered their asking price to the

Zestimate figure. When Mr. Koutropoulos declined, they did not hear further from that prospective buyer.

66. Because of their inability to sell, Mr. and Ms. Koutropoulos began to lower the sales price in an effort to attract a prospective buyer. However, this effort was futile given the Zestimate figure.

67. Finally, Mr. and Ms. Koutropoulos became frustrated with Zillow and their inability to sell FSBO. On approximately July 29, 2017, Mr. and Ms. Koutropoulos retained a broker to list the property on the MLS. A copy of the contract is attached hereto as Exhibit 19 and is incorporated herein by reference. The contract obligates Mr. and Ms. Koutropoulos to approximately pay $2,000 to the seller's brokerage firm and 2.5% of the sale price to the buyer's broker. See Exhibit 19, par. 11. Thus, if the home sells for the current, reduced listing price of $895,000, Mr. and Ms. Koutropoulos will now be obligated to pay approximately $24,375 from the sales price at closing.

68. Mr. and Ms. Koutropoulos believe that they could have sold their property by owner and not incurred this commission expense if the Zestimate had not improperly influenced prospective buyers' perceptions of their property's value.

69. Almost immediately upon listing their property with a broker, the Zestimate skyrocketed to its current Zestimate of approximately $776,969. A copy of the historical chart showing the rise at the end of July 2017 is attached hereto as Exhibit 20 and is incorporated herein by reference. A copy of the Zestimate from September 2017 is attached hereto as Exhibit 21 and is incorporated herein by reference. Mr. and Ms. Koutropoulos believe that their Zestimate was manipulated so as to rise upon the retention of a real estate broker; conversely, Mr. and Ms. Koutropoulos believe that there

is no good faith, factual basis for the Zestimate relative to their home at any time relevant hereto.

70.     Despite the recent increase in the Zestimate, the number is still approximately $120,000 under the current asking price. As of the time of the filing of this amended complaint, Mr. and Ms. Koutropoulos still have not yet seen serious buyers approach them.

71.     In early September 2017, Mr. and Ms. Koutropoulos attempted to e-mail customer service relative to the Zestimate.   In response, Mr. and Ms. Koutropoulos received a form letter.  A copy of the correspondence is attached hereto as Exhibit 22 and is incorporated herein by reference.   In the letter, Zillow encouraged Mr. and Ms. Koutropoulos to secure a "comparative market analysis" from a broker.  The form e-mail neglected to recognize that Mr. and Ms. Koutropoulos already had a broker and, as such, already had a comparative market analysis.

72.     Nowhere does Zillow advise prospective purchasers that its Zestimate should not be seriously considered in light of the existence of a comparative market analysis by a licensed Illinois real estate broker.

73.     Mr. and Ms. Koutropoulos believe that the buyers continue to understand and perceive the Zestimate as a legitimate valuation figure despite the disclaimer language on the website. Mr. and Ms. Koutropoulos further believe that (a) the Zestimate is an improper, unfair, confusing and deceptive trade practice which creates a misperception of value in the eyes of prospective buyers; (b) Zillow's refusal to address challenged Zestimates constitutes an improper, unfair, confusing and deceptive trade practice in that incorrect information continues to be publicly displayed so as to

perpetuate confusion and misperception in prospective buyers; and (c) that the radical movement of the Zestimate after retaining a broker demonstrates that the Zillow is manipulating its Zestimate.

**Witness Robin Bernard Relative to Her FSBO Home**

74.     Third party witness Robin Bernard owns a home at 1495 Clifford Road, Luray Tennessee.   Ms. Bernard and her husband purchased the home in August 2007 as a short sale for $185,000.  They made substantial improvements to the property since that time period.

75.     In late July 2017, Robin Bernard claimed her home on Zillow in her preparation to sell FSBO.  A true and correct copy of the e-mail recognizing her claiming of her home is attached hereto as Exhibit 23 and is incorporated herein by reference.

76.     At the time that Ms. Bernard claimed her home on July 24, 2017, the Zestimate showed a value of approximately $213,322.  A true and correct copy of the Zestimate from that date is attached hereto as Exhibit 24 and is incorporated by reference herein.

77.     At this time, Ms. Bernard listed her home for $359,000.   Then Ms. Bernard lowered her asking price to $340,000 after securing an appraisal shortly thereinafter.  A true and correct copy of the valuation page of Ms. Bernard's July 31, 2017 appraisal is attached hereto as Exhibit 25 and is incorporated herein by reference.

78.     Since Ms. Bernard posted her home FSBO in late July 2017, her Zestimate has plummeted.  At one point, her Zestimate plummeted to approximately $90,000. A true and correct copy of the historical data chart relative to Ms. Bernard's home and a screenshot from when it fell to approximately $90,000 are attached hereto as Group

Exhibit 26 and are incorporated by reference herein.

79.     Her current home's Zestimate is now approximately $115,000. A true and correct copy of a Zillow screenshot taken in September 2017 is attached hereto as Exhibit 27 and is incorporated herein by reference.

80.     Nowhere does Zillow advise prospective purchasers that (a) its Zestimate should not be seriously considered in light of the existence of a contradictory appraisal prepared by a licensed appraiser and (b) Zillow has ignored Ms. Bernard's demands to modify the Zestimate to reflect the valuation opinions of a licensed appraiser.

81.     In addition to the low Zestimate, Zillow has flagged her FSBO listing as "[b]eware of suspicious listings".   See Exhibit 27 (top left of screenshot).

82.     Upon information and belief, Zillow lists this "suspect listing" on only homes listed FSBO.   True and correct copies of additional "suspect listing" FSBO samples are attached hereto as Group Exhibit 28 and are incorporated herein by reference.

83.     Ms. Bernard attempted on multiple occasions to ask Zillow to fix the listing.  Ms. Bernard has received nothing but unhelpful rhetoric.  A true and correct copy of the e-mail correspondence between Ms. Bernard and Zillow is attached hereto as Group Exhibit 29 and is incorporated herein by reference.

84.     Since her listing in July 2017, Ms. Bernard has not been approached by any prospective buyer.  Ms. Bernard believes that the "suspect listing" warning and the low Zestimate are deterring prospective buyers from viewing her property.

85.     Ms. Bernard believe that the buyers continue to understand and perceive the Zestimate as a legitimate valuation figure despite the disclaimer language on the

website. Ms. Bernard also believes that (a) the Zestimate is an improper, unfair, confusing and deceptive trade practice which creates a misperception of value in the eyes of prospective buyers; (b) Zillow's "suspect listing" notification, Zestimate and refusal to address the Zestimate constitutes an improper, unfair and deceptive trade practice by Zillow in that it deters prospective buyers from seriously considering the listing as legitimate; (c) Zillow's "suspect listing" notification constitutes an improper, unfair and deceptive trade practice in that attempts to coerce FSBO sellers to retain premier broker; (d) Zillow's refusal to address challenged Zestimates constitutes an improper, unfair, confusing and deceptive trade practice in that incorrect information continues to be publicly displayed so as to perpetuate confusion and misperception in prospective buyers; and (e) the plummet in her property's Zestimate upon listing her property FSBO demonstrates that the Zillow is manipulating its Zestimate.

**Homes for Sale by Brokers**

86.    Plaintiff Vipul Patel is a custom home builder.  He runs a family construction business along with his parents and co-Plaintiffs, Bhasker T. Patel and Jyotsna B. Patel.  The name of the Plaintiff business is Castle Bldrs.com, Inc.

87.    At all times hereto, Mr. Patel was a licensed real estate broker.  However, Mr. Patel does not pay Zillow advertising monies and, as such, is not a "premier agent". Mr. Patel lists the family homes/properties on the MLS which therein feed into the Zillow website.

88.    Mr. Patel and his co-Plaintiff parents and business own several properties that are currently being adversely impacted by the Zestimate.    For example, Mr. Patel owns real property located at 1624 Columbine Dr, Schaumburg, Cook County, Illinois

60173 (PIN 07-13-403-0004-0000). Mr. Patel has owned this property for approximately 10 years. During this time period, the Zestimate has been an ongoing obstacle to sale.

89.     In his efforts to sell the Columbine property in 2016 and 2017, Mr. Patel noticed suspect Zestimate fluctuations. For example, when he temporarily removed his broker listing in the fall of 2016, his Zestimate plummeted; conversely, when he re-listed the property as his own broker, the Zestimate skyrocketed. A copy of the 5 year history chart is attached as Exhibit 30 and is incorporated herein by reference. Mr. Patel has also seen strange variations in Zestimates and historical charts for his clients and family members.

90.     Even with the recent positive fluctuation, the Zestimate has still posed as a tremendous roadblock to his ability to sell the Columbine Drive property. The Zestimate currently shows as $1,333,350. Over the course of his sale efforts, Mr. Patel has been forced to lower the asking price because prospective buyers have used the Zestimate to haggle with him relative to price.

91.     Mr. Patel noticed that when he lowered the asking price from $1.595 million (February 2017) towards the then-Zestimate figure of $1.4 million in April 2017, the Zestimate also dropped to its current Zestimate of $1,333,350. A copy of the current Zestimate is attached hereto as Exhibit 31 and is incorporated herein by reference.

92.     Likewise, Mr. Patel observed strange and wild fluctuations in the Zestimate charts over the course of his parents' properties. One example is the property located at 1492 Willow Road, Schaumburg, Illinois (07-24-101-008-0000). This property was purchased in 2008. Thereinafter, the home was torn down and a luxury

home was constructed. The cost of the purchase and construction was approximately $2 million dollars.

93. Like the Columbine property, the Zestimate has been deterring potential buyers for years. Mr. Patel attributes the Zestimate as to why his current asking price is $1,898,000, i.e. less than the approximate $2 million that it cost to purchase the land and construct the current home.

94. Even now, the Willow Road property shows approximately a $600,000-$700,000 difference between the current asking price of $1,898,000 and the Zestimate of $1,254,040. A copy of a September 2017 screenshot is attached hereto as Exhibit 32 and is incorporated herein by reference. According to Mr. Patel, there is no good faith and/or factual basis for this current Zestimate figure.

95. Like the Columbine property, the Zestimate relative to the Willow Road property has demonstrated volatile and unexplainable fluctuations. A true and correct copy of the 5 year historical chart relative to the Willow Road property is attached hereto as Exhibit 33 and is incorporated herein by reference.

96. As one example of the haggling that Mr. Patel experienced, Mr. Patel dedicated half a day to a prospective buyer relative to showing the Willow Road property. This prospective buyer was very interested in the property. However, the prospective buyer used the Zestimate as the basis of his offer. At the time, the Zestimate was a million below the then asking price. The prospective buyer told Mr. Patel that he would "not offer one penny higher than the Zestimate".

97. Mr. Patel has complained relative to the Zestimate impairing his ability to sell on several occasions. Each time that Mr. Patel complains, he either gets a form letter

telling him to get a comparative market analysis by a broker (despite the fact that he is one) or a "sales pitch" for him to become a premier agent. A copy of Mr. Patel's May 2017 correspondence is attached hereto as Exhibit 34 and is incorporated herein by reference. A copy of a recent solicitation that Zillow sent Mr. Patel is attached hereto as Exhibit 35 and is incorporated herein by reference.

98. Nowhere does Zillow advise prospective purchasers relative to the above-properties that (a) its Zestimate should not be seriously considered in light of the existence of a contradictory comparative market analysis by Mr. Patel as a licensed Illinois real estate broker and/or (b) Zillow has ignored Ms. Patel's demands to modify the Zestimate to reflect the comparative market analysis of the property.

99. Mr. Patel believes that (a) the Zestimate is nothing more than a marketing ploy to draw consumers to Zillows' website and (b) Zillow is using this consumer draw from the Zestimate as a means of soliciting brokers and/or developers to paying Zillow advertising dollars. Mr. Patel believes that Zillow is indifferent as to the confusion that it has created for sellers and buyers. Rather, Mr. Patel believes that Zillow's sole focus is generating maximum advertising revenues for itself.

100. Mr. Patel further believes that the Zestimate is widely misunderstood and misperceived as an accurate valuation tool by the consumer buying public. Mr. Patel believes that the Zestimate is not based in public data and/or proper valuation methodology. Mr. Patel believes that the Zestimate is a confusing, unfair and deceptive advertising and trade practice that should be prohibited in all real estate transactions.

**Third Party Orendeff Steele And His Experiences Through Brokers**

101.     Third party witness and prospective class plaintiff Orendeff Steele owns real property located at 1524 Darien Club Drive, Darien, Illinois.  He has attempted to sell  his property is 2014, 2015 and again now.  In his 2014-2015 efforts, Mr. Steele experienced several buyers attempting to use the Zestimate to leverage him into lowering his price.  The Zestimate was a great roadblock to his sale efforts.

102.     Mr. Steele again attempted to re-list his property through a broker in March 2017 for $815,000.   When he re-listed the property through a broker, his Zestimate skyrocketed. A copy of the one-year historical chart is attached hereto as Exhibit 36 and is incorporated herein by reference.   (See March 2017 time frame on chart.)

103.     Despite the rise in the Zestimate, the number still remained low.  With the Zestimate as a continued roadblock, Mr. Steele recently decided to lower his asking price (which was $780,000 at the time) on September 7, 2017. When he lowered the price, the Zestimate was showing as approximately $759,000.  Mr. Steele lowered the asking price to $740,000, i.e. below the $759,000 Zestimate, with the expectation that this would draw in buyers.   A copy of the screenshot showing the September 1, 2017 Zestimate as $759,000 is attached hereto as Exhibit 37 and is incorporated herein by reference.

104.     When Mr. Steele lowered his asking price, the Zestimate thereinafter fell from $759,000 to $734,381 in a matter of days.  A copy of the new Zestimate from a screenshot taken on September 9, 2017 is attached hereto as Exhibit 38 and is incorporated herein by reference.

105.    Mr. Steele does not believe that the Zestimate is tied to any proper public data.  Rather, Mr. Steele believes that the Zestimate is improperly tied to factors such as brokerage retention and/or asking price.

106.    Nowhere does Zillow advise prospective purchasers relative to Mr. Steele's property that the Zestimate should not be seriously considered in light of the existence of a contradictory comparative market analysis performed by Mr. Steele's licensed real estate broker.

107.    Mr. Steele believes that the consumer buying public is misunderstanding and misperceiving the Zestimate as an accurate valuation tool.   Mr. Steele believes that the Zestimate is a confusing, unfair and deceptive advertising and trade practice that should be prohibited in all real estate transactions.

**Third Party Witness John Allegretti And His Experiences Through Brokers**

108.    Third party witness John Allegretti owns real property located at 674 Longwood Drive, Sawyer, Michigan 49125. Mr. Allegretti, and his father before him, is/were architects.  Mr. Allegretti had his home appraised in 2015 for $1,850,000.  A true and correct copy of the opinion of value page of the appraisal is attached hereto as Exhibit 39 and is incorporated herein by reference.   The home is directly on Lake Michigan in a highly desirable location.

109.    Before the Zestimate tool, Mr. Allegretti would regularly sell properties "up and down" lake Michigan without issue either for asking price and/or 10% under. Further, Mr. Allegretti would be able to sell his designed/constructed homes typically within 6 months.  Mr. Allegretti believes that the Zestimate has substantially harmed the sale of his personal home and the residential real estate market generally.

110.    The Zestimate has been plaguing Mr. Allegretti's ability to sell for years. Likewise, for many years, Mr. Allegretti and his broker have been writing to Zillow to correct it.   Currently, Mr. Allegretti is asking $1,575,000 for the home.   However, the current Zestimate is approximately $1 million dollars less at $551,706.    A true and correct copy of the September 14, 2017 screenshot of the property is attached hereto as Exhibit 40 and is incorporated herein by reference.

111.    Nowhere does Zillow advise prospective purchasers that (a) its Zestimate should not be seriously considered in light of the existence of both contradictory appraisals and comparative market analysis by licensed appraisers and brokers and/or (b) Zillow has ignored Ms. Allegretti's demands to modify the Zestimate to reflect actual appraisal and comparative market analysis of his property.

112.    Mr. Allegretti does not believe that the Zestimate is tied to any proper public data.    Mr. Allegretti also believes that the consumer buying public is misunderstanding and misperceiving the Zestimate as an accurate valuation tool.    Mr. Allegretti believes that the Zestimate is a confusing, unfair and deceptive advertising and trade practice that should be prohibited in all real estate transactions.

**Buyers Understand and Perceive the Zestimate as Accurate**

113.    According to third party witness Illinois real estate broker Ms. Banks (see *supra*): (a) despite the disclaimer that the Zestimate is a "starting point", the perception of buyers is nevertheless that the Zestimate valuation is trusted and reliable; (b) when the Zestimate is too low, prospective buyers cannot understand why they should pay more than the Zestimate amount because of their perception of its reliability; and (c) she has experienced the Zestimate as a roadblock to sale from both the seller's and buyer's perspectives.

114.    Third party witness Pam Merrigan, associate at Re/Max Metropolitan in Kansas City Missouri also observes regularly how consumers, buyers, fellow realtors and appraisers understand, perceive, opine and attempt to implement the Zestimate as a valuation tool despite the disclaimer.   Buyers regularly use the Zestimate to make offers relative to purchasing property because of their misperception as to its reliability.

115.    Moreover, in her experience, Ms. Merrigan notes that the Zestimate adds unnecessary confusion to real estate transactions and, further, undermines the legitimate opinions of licensed real estate agents and appraisers.   Ms. Merrigan refers to the Zestimate as "snake oil" that not only makes her job harder, but also "really hurts the consumers".   Ms. Merrigan also notes that fiduciary duties and ethical considerations of real estate agents are triggered because the Zestimate confusion (a) may lead to either brokers preying on consumers to seek otherwise unnecessary retention; (b) may lead lazy and/or incompetent seller's brokers to rely on the Zestimate in listing the property at too low of an asking price; and (c) may lead unlisted homeowners and FSBO sellers to unnecessarily retain real estate agents and pay unnecessary commissions to them.

**Likelihood of Future Harm –Buyers Misunderstandings and Misperceptions as to the Accuracy and Reliability of the Zestimate Will Continue**

116.    As noted above, Zillow refuses to alter and/or remove the Zestimate under any circumstance.   This includes even when the Zestimate is challenged with a certified appraisal and/or comparative market analysis opinion of a broker.   As such, by Zillows' refusal to cure and/or correct, the Zestimate problems go unresolved.

117.    Although the Plaintiffs as sellers are themselves cognizant of the confusing and deceptive native of the Zestimate and additional deceptive trade practices,

prospective buyers of Plaintiffs' properties still remain in the dark. As such, when they approach the Plaintiffs' properties, they perceive the Zestimate as a valuable and reliable valuation tool instead of a marketing device to lure them to Zillow's website. Accordingly, Zillow's Zestimate and their additional deceptive trade practices will continue to cause confusion and thwart Plaintiffs' efforts to sell their respective properties.

118.    Here, because Zillow refuses to stop the future harm caused by its Zestimate and deceptive practices, injunctive relief is justified and appropriate pursuant to 815 ILCS 510/3.

**Summary of Deceptive Practices and Request for Relief**

119.    In sum, the above-advertising and trade practices include:

(a)    The Zestimate is deceptive trade practice under 815 ILCS 510(a)(3) in that it causes the likelihood of confusion to Plaintiffs and Illinois homeowners given that it is promoted as a reliable and valuable valuation resource wherein the reality it is nothing more than a suspect marketing gimmick to draw people to its website so that it can solicit advertising revenue from real estate brokers, lenders, etc.;

(b)    Zillow's refusal to resolve or remove challenged Zestimate issues in good faith is a deceptive trade practice in that it (a) perpetuates improper confusion in the marketplace in violation of 815 ILCS 510/2(a)(3); (b) constitutes an improper and bad faith disparagement of Plaintiffs' properties in violation of 815 ILCS 510(a)(8) and (11) given that they are aware of the existence of information that undermines the validity of the Zestimate; and (c) constitutes an advertisement of property with the intent to not sell them as advertised in violation of 815 ILCS 510(a)(9)

(c)     Zillow's "suspect listing" designation of FSBO properties constitutes a deceptive trade practice in violation of 815 ILCS 510/2(a)(3), (8) and (9) given that there is no good faith reason to label FSBO in this manner.

120.    Here Zillow has publicly admitted that its deceptive usage of the Zestimate was "intentional" so as to be "voyeuristic" and "provocative", rather than accurate.   As such, Plaintiffs request reimbursement of its costs and attorneys' fees under 815 ILCS 510/3 for its "willful" conduct.

Wherefore, Plaintiffs request the following relief:

(a)     That Zillow be directed to cease posting Zestimates on Plaintiffs and Illinois residents' property without first securing their advance consent;

(b)     When challenged with a request to modify the Zestimate to conform to a recent certified appraisal, that Zillow be ordered to modify the Zestimate so as to conform to the appraisal or remove the Zestimate;

(c)     When challenged by an Illinois licensed real estate broker with a request to modify the Zestimate to conform to comparative market analysis valuations, that Zillow be ordered to modify the Zestimate to conform to the comparative market analysis or remove the Zestimate;

(d)     When asked to remove the Zestimate from its website by any homeowner, seller or authorized broker for any reason, that Zillow be ordered to remove the Zestimate;

(e)     That Zillow be ordered to remove all "suspect listing" warnings relative to all FSBO homes; and

(f)     That Zillow be ordered to reimburse Plaintiffs and Plaintiffs' counsels for reasonable costs and attorneys' fees relative to this litigation.

**COUNT II-REQUEST FOR ACTUAL DAMAGES, REIMBURSEMENT OF COSTS, PUNITIVE DAMAGES AND ATTORNEYS' FEES PURSUANT TO THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**

121.    Plaintiffs and the Class reincorporate paragraphs 1 through 120 as though stated herein by reference as paragraph 121.

122.    At all times relevant hereto, the Consumer Fraud and Deceptive Business Practices Act has applied.  In relevant part, it provides as follows:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act.

815 ILCS 505/2.   Further, the Act provides:

> (a) Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper; ....

815 ILCS 505/10a.   "The term "person" includes any natural person or his legal representative, partnership, corporation (domestic and foreign), company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof."  815 ILCS 505/1(c ).

41

**Violation of the Uniform Deceptive Trade Practices Act**

123.　　Here, Zillow has engaged in improper, unfair and deceptive conduct in the course of engaging in commerce.

124.　　Here, the violations of the Uniform Deceptive Trade Practices Act (discussed and incorporated herein by reference *supra*) also constitute a violation herein. These violations are also actionable under ICFA given that persons have "in fact been misled, deceived or damaged thereby" (discussed in more detail below).

**Additional ICFA Violations- - Unfair Conduct**

125.　　In addition to the above violations of the Uniform Deceptive Trade Practices Act, Plaintiffs and the Class are also entitled to additional ICFA protections. By incorporating Section 5 of the Federal Trade Commission Act, the ICFA also prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce…." 15 U.S.C. §45(a)(1).

126.　　Section 5 of the Federal Trade Commission Act also clarifies unfair practices as follows:

> **(n)Standard of proof; public policy considerations**
>
> The Commission shall have no authority under this section or section 57a of this title to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination.

15 U.S.C. §45(n).

127.　　As discussed above, Zillow's practice of creating and posting unlicensed and suspect Zestimates against people's homes is unfair. Specifically, it is unfair and

violative of public policy for a seller to be unable to sell his/her home (a) without the realistic ability to do so FSBO; (b) while being coerced by Zillow's "funneling" and improper trade practices to retain a real estate broker; (c) while Zillow, an unlicensed and untrained data company, offers opinions of value without proper due diligence and/or permission; and (d) while Zillow refuses to take down those opinions of value even when challenged by opinions by licensed professionals, including licensed appraisers and real estate brokers.

128. Moreover, public policy also supports the prohibition of Zillow's unfair trade practices given that these transactions involve real estate and, indirectly, can also affect federally backed mortgages. Here, as noted above, Zillow's advertising affects real estate transactions. As such, there are also federal RESPA public policies that become relevant when referral/kickback marketing and co-marketing practices lead to higher and unnecessary brokerage costs for both sellers and buyers (and, therein, lenders). See 12 U.S.C. §2607(a); 24 CFR §3500.14; see also CFPB Compliance Bulleting 2015-05. Because of Zillow's unfair trade practices, the likelihood of these RESPA violations is more probable.

129. Here, the Zestimate and the additional improper trade practices are "so oppressive that the consumers have little choice but to submit". First, because of the confusion surrounding the Zestimate and Zillow's refusal to cure Zestimates, both prospective sellers and FSBO sellers are pragmatically coerced to retain a broker. Second, because of the "suspect listing" label, FSBO sellers are further stigmatized and coerced to retain a broker so as to rid themselves of this label. Third, because Zillow refuses to modify and/or remove the Zestimate even when challenged with an appraisal

or comparative market analysis by a properly licensed professional, Zillow coerces many sellers to accept artificially low offers because of the inability to otherwise sell.

130.    Finally, the Zestimate and additional improper trade practices cause substantial harm.  First, because of the confusion surrounding the Zestimate and Zillow's refusal to cure, consumers are being forced to pay otherwise unnecessary commission; obviously, given that the range can generally be 2.5% -6% on the sale price, these figures can be enormous when considering that the problem affects all residential real estate transactions in Illinois (and nationally).  Second, in the context of FSBO, the fact that these sellers are being forced to retain a broker causes substantial harm given that they could have sold the properties on their own with no brokerage cost.  Third, in the context of those properties sold by brokers, the refusal to cure the Zestimates can lead to substantial harm for the sellers given that the buyers use the Zestimate as an improper negotiating tool in an effort to arbitrarily coerce down the asking price.

**Additional ICFA Violations—Deceptive Conduct**

131.  Moreover, the ICFA also prohibits deceptive conduct, including deceptive advertising practices.  For example, the Federal Trade Commission Act prohibits bait advertising:

> Bait advertising is an alluring but insincere offer to sell a product or service which the advertiser in truth does not intend or want to sell. Its purpose is to switch consumers from buying the advertised merchandise, in order to sell something else, usually at a higher price or on a basis more advantageous to the advertiser. The primary aim of a bait advertisement is to obtain leads as to persons interested in buying merchandise of the type so advertised.
> ****
> No advertisement containing an offer to sell a product should be published when the offer is not a bona fide effort to sell the advertised product.

16 C.F.R. 238.0; 16 C.F.R. 238.1.

132.    Likewise, the following is considered an unfair advertising trade practice:

No act or practice should be engaged in by an advertiser to discourage the purchase of the advertised merchandise as part of a bait scheme to sell other merchandise. Among acts or practices which will be considered in determining if an advertisement is a bona fide offer are:

   ….

(b) The disparagement by acts or words of the advertised product or the disparagement of the guarantee, credit terms, availability of service, repairs or parts, or in any other respect, in connection with it,

16 C.F.R. §238.3.

133.    Here, the Zestimate constitutes an improper bait scheme given that Zillow uses the confusion surrounding the Zestimate as a means of "funneling" prospective sellers and FSBO sellers to real estate brokers.  By creating a "road to nowhere" in resolving challenged Zestimates, Zillow improperly coerces prospective sellers and FSBO sellers into retaining brokers because they perceive this as the only avenue to resolve the confusion surrounding the Zestimate.  In the process, the prospective sellers and FSBO sellers are unaware that Zillow uses the Zestimate as a means of giving quid pro quo to the brokers who pay Zillow for advertising.

134.    Here, the Zestimate also constitutes an improper bait scheme when Zillow refuses to modify and/or delete it when presented by an appraisal and/or comparative market analysis by a licensed appraiser.  Specifically, because Zillow has actual notice of the fact that its opinion is being affirmative challenged by a licensed professional, its refusal to modify and/or delete the Zestimate (a) improperly disparages the property; (b) improperly deters prospective buyers from considering the property; and (c) leads the prospective buyers elsewhere.

135.    Finally, the FSBO "suspect listing" designation constitutes improper bait advertising.  Specifically, the "suspect listing" designation has the obvious intent and

effect of frightening off prospective buyers to other properties which do not have this designation. Given that broker-listed properties do not have this "suspect listing" designation, the bait scheme is clearly intended to (a) make FSBO efforts to sell unsuccessful and (b) steer prospective purchasers to properties represented by brokers.

**Intent that Plaintiff Rely on Unfair and Deceptive Practices and Actual Damages**

136. As demonstrated above, Zillow has been very clear that (a) its Zestimate is "intentional" "provocative" and "voyeuristic"; (b) its Zestimate is not only not premised in USPAP, but is reckless even under AVM models; (c) brokers should prey on the confusion created by the Zestimate in soliciting consumers; (d) Zillow inconsistently tells the general consumer public that the Zestimate is accurate, yet admits to its premier agents that it is not; and (e) Zillow will not cure errors in the Zestimate even when presented with appraisals and/or comparative market analysis. Further, the strange fluctuations of the Zestimate dependent of brokerage retention and/or asking price demonstrate that Zillow is manipulating its AVM with factors outside of public data and relevant valuation information.

137. In taking its course of action, Zillow is clear that it is does not remedy its confusion and that it intends that the consumers rely on its improper, unfair and deceptive trade practices so that consumers are coerced and "funneled" to premier agents.

138. Plaintiffs and the Class have been monetarily damaged in their inability to sell their home by being forced to incur carrying costs relative to the inability to sell the properties. These costs include the payment of mortgages, taxes, home owner association costs, utilities and maintenance costs.

139.     Here, the Zestimate and Zillow's unfair and deceptive trade practices have proximately caused the Plaintiffs to be damages.   Specifically, Plaintiffs Mr. and Ms. Koutropoulos have been forced to continue to pay a costly monthly mortgage to its lender (including interest on principal) while waiting for their home to sell.  In addition, Mr. and Ms. Koutropoulos are being forced to unnecessarily pay utilities, storage fees, maintenance costs and real estate taxes. Conservatively, Mr. and Ms. Koutropoulos pay in excess of $6,000 in costs per month while they wait for their home to sell.

140.     Mr. and Ms. Koutropoulos would not be forced to pay these expenses had they already sold given it is their intention to rent a less expensive home after their sale.

141.     Moreover, Mr. and Ms. Koutropoulos will now be forced to pay the otherwise unnecessary brokerage commission when they sell.

142.     Likewise, Mr. Patel, his family and his business have been forced to pay at least 3 monthly mortgage payments to their respective lenders (including interest on principal) while waiting for their homes/properties to sell.  Likewise, Mr. Patel, his family and business are being forced to incur unnecessary expenses, including home owner association assessments, utilities, property maintenance charges and real estate taxes.  Conservatively, Mr. Patel and his family and his business pay $10,000 -$15,000 per month in costs while they wait for their properties/homes to sell.

**Request for Punitive Damages**

143.     Here, the conduct of Zillow relative to its deceptive and unfair trade practices is  outrageous because acts are performed with malice, evil motive, or reckless indifference toward rights of others.   Specifically, as discussed above, Zillow is (a) recklessly indifferent relative to the accuracy of its Zestimate; (b) recklessly indifferent in

removing contested Zestimates even when presented with challenges based on contradictory appraisals and/or comparative market analysis; (c) malicious in their "suspect listing" treatment of FSBO sellers; (d) recklessly indifference in allowing the Zestimate be tied to improper valuation factors such as the retention of a broker and/or asking price; and (e) admittedly malicious in the fact they are posting Zestimates recklessly so as to draw persons to their website and/or "funnel" confused sellers unnecessarily to real estate brokers for their and their premier agents' financial benefit.

**Request for Relief**

Wherefore, Plaintiffs request the following relief:

(a)     That Zillow be directed to cease posting Zestimates on Plaintiffs and Illinois residents' property without first securing their advance consent;

(b)     When challenged with a request to modify the Zestimate to conform to a recent certified appraisal, that Zillow be ordered to modify the Zestimate so as to conform to the appraisal or remove the Zestimate;

(c)     When challenged by an Illinois licensed real estate broker with a request to modify the Zestimate to conform to comparative market analysis valuations, that Zillow be ordered to modify the Zestimate to conform to the comparative market analysis or remove the Zestimate;

(d)     When asked to remove the Zestimate from its website by any homeowner, seller or authorized broker for any reason, that Zillow be ordered to remove the Zestimate;

(e)     That Zillow be ordered to remove all "suspect listing" warnings relative to all FSBO homes;

(f)     That Zillow be ordered to reimburse the Plaintiffs and Class for actual damages proximately caused by Zillow's violation of this Act;

(g)     That this Court award Plaintiffs and the Class punitive damages; and

(h)     That this Court award order the reimbursement of costs and attorneys' fees pursuant to 815 ILCS 805/10a(c).

**Jury Demand**

Plaintiffs and the Classes Hereby Demand a Trial By Jury

Vipul B. Patel, individually, Bhasker T Patel,as the co-Trustee of the Jyotsna B Patel Living Trust dated March 9, 2001, Jyotsna B. Patel, as co-Trustee of the Jyotsna B. Patel Living Trust dated March 9, 2001, Castle Bldrs.com, Inc., an Illinois corporation, Nancy Koutropoulos, and Ulysses Koutropoulos

_____/s/ Barbara Andersen_____
One of their attorneys

Barbara Andersen
Andersen Law LLC
2862 Commons Drive
Glenview, IL 60026
(708) 805-1123
Attorney Number 48993
bandersen@andersen-law.com

C. Jeffrey Thut
Noonan Perillo & Thut Ltd.
25 North County Street
Waukegan, Illinois 60085
(847) 244-0111
jthut@npt-law.com